UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------- x

ANTHONY BARBERAN,

Plaintiff,

-against-

TOWN OF EASTCHESTER, TIMOTHY BONCI, Individually and in his Official Capacity as Eastchester Chief of Police, and JEFFREY HUNTER, Individually and in his Official Capacity as Eastchester Police Lieutenant,

Defendants.

---------------------------------------- x

Index No. 19-cv-10983-VB

**SECOND AMENDED COMPLAINT and JURY DEMAND**

Plaintiff, ANTHONY BARBERAN, by his attorneys, SUSSMAN & ASSOCIATES, states for his Second Amended Complaint:

## NATURE OF CLAIMS

1. This action is based on violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*; Section 1983 of the Civil Rights Act of 1871, as amended ("Section 1983"), 42 U.S.C. § 1983; and the New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law §§ 290 *et seq.*, by Defendant TOWN OF EASTCHESTER in discriminating against Plaintiff ANTHONY BARBERAN based upon his failure to conform to racial stereotypes, and in retaliating against him for complaining of discrimination.

2. This action is also based on violations of Section 1983 and the NYSHRL, by Defendants TIMOTHY BONCI, Individually and in his Official Capacity as Eastchester Chief of Police, and JEFFREY HUNTER, Individually and in his Official Capacity as Eastchester Police Lieutenant, in discriminating against Plaintiff ANTHONY BARBERAN based upon his failure to

conform to racial stereotypes, and in retaliating against him for complaining of discrimination.

## PARTIES

3. At all times relevant herein, Plaintiff ANTHONY BARBERAN ("Plaintiff" or "Officer Barberan") is and was a natural person residing in the County of Westchester, State of New York. Plaintiff is of Hispanic descent.

4. At all times relevant herein, Defendant Town of Eastchester ("the Town") is and was a Town within the County of Westchester, State of New York.

5. The Town is liable under Title VII because it is and was Officer Barberan's employer within the meaning of Title VII.

6. The Town is also liable under the NYSHRL because it is and was the Officer Barberan's employer within the meaning of the NYSHRL and it was a party to the discriminatory and retaliatory adverse actions taken against Officer Barberan.

7. The Town is also liable under Section 1983 because the adverse actions taken against Officer Barberan violated the Equal Protection Clause of the Fourteenth Amendment, and occurred as a result of the official policy, custom, pattern, or practice of the Town.

8. At all times relevant herein, Eastchester Police Department ("the Department") is and was a police department of the Town, within the County of Westchester, State of New York.

9. At all times relevant herein, Defendant Timothy Bonci ("Chief Bonci") is and was the Chief of Police of the Department.

10. Chief Bonci is liable under the NYSHRL because he is and was Officer Barberan's employer within the meaning of the NYSHRL.

11. Chief Bonci is also liable under the NYSHRL because he aided and abetted these adverse actions.

12. Chief Bonci is also liable, in his official capacity, under Section 1983 because the adverse actions taken against Officer Barberan violated the Equal Protection Clause of the Fourteenth Amendment, and occurred as a result of the official policy, custom, pattern, or practice of the Town.

13. Chief Bonci is also liable, in his individual capacity, under Section 1983 because he was personally involved in these adverse actions.

14. At all times relevant herein, Defendant Jeffrey Hunter ("Lieutenant Hunter") is and was a Lieutenant of the Department.

15. Lieutenant Hunter is liable under the NYSHRL because he aided and abetted the adverse actions taken against Officer Barberan.

16. Lieutenant Hunter is also liable, in his official capacity, under Section 1983 because these adverse actions violated the Equal Protection Clause of the Fourteenth Amendment, and occurred as a result of the official policy, custom, pattern, or practice of the Town.

17. Lieutenant Hunter is also liable, in his individual capacity, under Section 1983 because he was personally involved in these adverse actions.

**JURISDICTION AND VENUE**

18. This Court has subject matter jurisdiction over Officer Barberan's Title VII and his Section 1983 claims which arise under federal laws.

19. This Court has supplemental jurisdiction over Officer Barberan's NYSHRL claims pursuant to 28 U.S.C. § 1367(a), because those claims arise from th same nucleus of operative facts as his Title VII claims and Section 1983 claims.

20. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the Town is located in the Southern District of New York, Officer Barberan resides in this District, the unlawful

actions complained of occurred in this District, and the records relevant to such practices are maintained in this District.

21. Officer Barberan has fully complied with the administrative prerequisites for commencement of this action pursuing claims under Title VII. On or about December 20, 2018, Officer Barberan filed a Charge of Discrimination with the Equal Employment Opportunity Commission alleging employment discrimination based upon his failure to conform to racial stereotypes, and retaliation for his complaints of discrimination. The EEOC issued a Notice of Right to Sue on August 29, 2019. The Complaint was filed within 90 days of receipt of the Notice of Right to Sue.

22. Plaintiff further filed an EEOC charge in late February 2021 relating to the discriminatory and retaliatory nature of the charges which defendants had recently propounded against him and which defendants used to predicate the termination of his employment in November 2021.

## FACTS UNDERLYING LEGAL CLAIMS

<u>Background Information about Officer Barberan and the Department</u>

23. Officer Barberan, who is Hispanic, joined the Department, an approximately 48-member police force, on July 30, 2012.

24. At that time, and continuing until approximately 2016, the entire Department was Caucasian, except for one Hispanic female.

25. In or around 2016/2017, one black male, one Hispanic female, and one other Hispanic male joined the Department.

26. However, the Hispanic male, Ramon Rosado, left after only a couple of years after raising allegations that Lieutenant Hunter harassed him on the basis of his race.

27. Officer Barberan has been supervised for most of his tenure by Chief Bonci and Lieutenant Hunter.

28. Chief Bonci administers the Department, is the Chief Executive Officer of the Department, and has full control of the members of the Department.

29. Chief Bonci's duties include, but are not limited to, developing and implementing Department rules, regulations, policies and procedures.

30. Chief Bonci is also responsible for recommending officers for promotion.

31. At all relevant times up until August 2018, Lt. Hunter commanded the Patrol Division.

32. As such and subject to direction from the Chief, Lieutenant Hunter had direct control over policies officers within the Division.

33. As the commanding officer of the Patrol Division, Lieutenant Hunter's responsibilities included, but were not limited to, monitoring the activities of the various divisions within the Department to make certain that there was adequate communication, cooperation, and coordination; deploying officers within the Patrol Division so that the Town's laws could be enforced effectively; planning, coordinating, and formulating goals and objectives for the Patrol Division; issuing performance evaluations; and conducting investigations of police officers.

34. Both Chief Bonci and Lieutenant Hunter are Caucasian.

35. Upon information and belief, most members of the Department, including Chief Bonci and Lieutenant Hunter, were raised, and still reside, in Eastchester, New York (an affluent, mostly Caucasian community).

36. Officer Barberan was raised in an underprivileged, racially diverse neighborhood in Yonkers, New York.

37. Although Officer Barberan later moved to Eastchester as an adult, the cultural influences of his childhood and adolescence have shaped him.

38. Officer Barberan has performed his duties both faithfully and professionally, within the guidelines of the Department.

39. He has generally received positive evaluations.

40. Officer Barberan is well-respected by his fellow officers, aside from Lieutenant Hunter and Chief Bonci.

41. Lieutenant Hunter has criticized Officer Barberan for not speaking and acting as he believes a Caucasian officer should.

Comments Revealing Discriminatory Animus Towards Officer Barberan
for Failing to Conform to Racial Stereotypes

42. Lieutenant Hunter's discriminatory animus first became evident in the summer of 2014, during an investigation into Officer Barberan's inability to locate a razor blade hidden on a suspect.

43. Officer Barberan immediately acknowledged that he had not found the razor blade and fully cooperated with the Department's investigation.

44. Still, during an interview in which Officer Barberan's union representative and union lawyer were also present, Lieutenant Hunter suggested that Officer Barberan should not be a cop.

45. Lieutenant Hunter also offered his opinion that perhaps Officer Barberan's being raised in Yonkers "wasn't the best approach", and that they do things differently in Eastchester.

46. When Officer Barberan asked Lieutenant Hunter what he was implying, he replied that there have been other incidents besides the most recent one.

47. When pressed by Officer Barberan, Lieutenant Hunter was only able to reference Officer Barberan having been informally counseled earlier that year – along with several other patrolmen – for not wearing their "8-point" hats while on duty.

48. Ultimately, as a penalty, Lieutenant Hunter and Chief Bonci took four days of pay from Officer Barberan.

49. Upon information and belief, aside from one other officer who voluntarily offered up a single day of pay in order to resolve a misconduct allegation, the Department has not disciplined anyone else by docking their pay during Officer Barberan's tenure.

50. Following this incident in the summer of 2014, Officer Barberan continued to perform his law enforcement duties.

51. In September 2015, however, Lieutenant Hunter scheduled a meeting with Officer Barberan, ostensibly to review his policing tactics.

52. During the meeting, the men watched a video of a traffic stop Officer Barberan had conducted the previous shift.

53. While speaking to the occupants of the vehicle, Officer Barberan used the phrase "you know what I'm sayin'" several times. Lieutenant Hunter expressed that he did not like the way Officer Barberan spoke with these individuals, instructed him on how to speak "properly," and ordered him to attend "remedial training."

54. When Officer Barberan asked for justification for the criticism and the required "remedial training", Lieutenant Hunter became agitated and stated that he knew Officer Barberan

was from Yonkers and did not grow up in "Town". He then stated: "Your Yonkers ghetto doesn't add up to my Eastchester professional."

55. At this point, Lieutenant Hunter pulled up a video on his computer of a black hip hop artist with no shirt, baggy pants hanging low, with underwear showing, dreadlocks, big chains, and a backwards hat.

56. Lieutenant Hunter laughed as he explained that this was how Officer Barberan was presenting himself.

57. Officer Barberan was shocked and offended. He told Lieutenant Hunter that he could not believe he had just showed him that video. Lieutenant Hunter simply responded: "Your attitude and ways are not how I want my officers to look and act."

58. At the start of the "remedial training" in September 2015, Lieutenant Hunter sarcastically said to Officer Barberan that "this is what Yonkers does," and "this is how Yonkers trains its men," indicating that officers from Yonkers required training to bring their less polished speech and mannerisms into conformity with how things are done in Eastchester.

Harassment of Officer Barberan for Failing to Conform to Racial Stereotypes

59. At the start of the remedial training in September 2015, Lieutenant Hunter instructed Officer Barberan to make ten traffic stops per day.

60. When Officer Barberan asked whether he was supposed to issue tickets during these stops, Lieutenant Hunter said that rather than issuing tickets, the focus of this training was on communication.

61. Nonetheless, after the first few days, despite Lieutenant Hunter's earlier instructions to focus on communication, he reprimanded Officer Barberan for failing to issue enough tickets.

62. Thereafter, Lieutenant Hunter imposed a ticket quota on Officer Barberan and ordered Sergeant Glen Conacchio to ride with Officer Barberan to ensure that plaintiff wrote up to three or four tickets per day.

63. In the cell room, after their third or fourth day of riding together, Officer Barberan complained to Sergeant Conacchio that there was no basis for sending him to "remedial training."

64. Sergeant Conacchio admonished Officer Barberan that his "bitching" was not good and sought to intimidate Officer Barberan by cautioning him that there was another officer who once "bitched" like Officer Barberan, and that his name was Ramon Rosado.

65. Rosado was formerly employed as a police officer with the Department.

66. Mr. Rosado, who is Hispanic, had been suspended by Lieutenant Hunter, and then left the Department after he made allegations of race discrimination against the Department.

67. In or around September or October 2015, Officer Barberan complained to his union that there was no legitimate basis for the "remedial training" which he was required to take.

68. Following this, Lieutenant Hunter approached Officer Barberan's step-father, Kenneth Simonides, who Lieutenant Hunter knew well, and attempted to obtain negative personal information about Officer Barberan – asking about his life outside of work.

69. Mr. Simonides told Lieutenant Hunter that Officer Barberan was a good kid, always performed well, and that he should be given the opportunity to prove himself.

70. The conversation ended when Lieutenant Hunter told Mr. Simonides that "it is all going to end soon," revealing Lieutenant Hunter's ultimate objective - to remove Officer Barberan from the Department.

71. At the start of a shift in November 2015, towards the end of his "remedial training," Officer Barberan asked Detective Paul Santomauro, who was handling roll call, whether there was

any particular assignment for him that day. Detective Santomauro replied that there was nothing specific written down.

72. Officer Barberan therefore went on patrol as he normally would. During the course of that shift, an intense storm developed. In Officer Barberan's judgment, it would have been unsafe to make car stops that day, both for himself and the drivers. Consequently, he responded to his calls, but did not write any tickets.

73. When Officer Barberan returned to the station at the end of his shift, Lieutenant Hunter, enraged, pulled him into his office and scolded him for not meeting a quota of performing ten car stops and got noy writing any tickets.

74. Hunter screamed at Officer Barberan: "who do you think you are?" and "do you think you run this department?"

75. When Officer Barberan requested the presence of a union representative, Lieutenant Hunter told him he was not getting a union representative and stated falsely that the union did not like him and did not want to represent him, and also stated falsely that none of Officer Barberan's bosses liked him. (Later, when confronted by union president Detective Frank Casey, Lieutenant Hunter admitted that he had no evidence to support those assertions.)

76. Notwithstanding Lieutenant Hunter's protests, union representative Sergeant Anthony Mignone did eventually join their meeting.

77. However, as Officer Barberan attempted to bring Sergeant Mignone up to speed, Lieutenant Hunter kept interrupting.

78. Frustrated, referencing Lieutenant Hunter's prior demeaning and discriminatory comments, Officer Barberan exclaimed: "The reason I'm here is because my 'Yonkers ghetto doesn't add up to your Eastchester professional'."

79. At this, Lieutenant Hunter began laughing, and said to Sergeant Mignone: "See what I'm saying about this kid, he's got an attitude."

80. When Officer Barberan asked Lieutenant Hunter if he was denying having previously made the "Yonkers ghetto" comment, Lieutenant Hunter did not respond.

81. A couple months later, in January 2016, Officer Barberan wrote 14 traffic tickets and 39-40 parking tickets, numbers above-average for the Department.

82. Nonetheless, at the end of that month, Lieutenant Hunter instructed Sergeant Richard Flood to place Officer Barberan on a detail for not writing enough tickets. This meant that, for one to two hours each shift, plaintiff was to be stationed at a specific stop sign to write tickets, with no discretion.

83. When Officer Barberan asked why he was being assigned this detail considering that his enforcement numbers were good, another supervisor, Sergeant Kevin Tiederman berated him for asking questions.

84. Later, Sergeant Tiederman confided that he had not intended to be harsh with him, but merely wanted to see Officer Barberan avoid ending up in Lieutenant Hunter's office again, reconfirming that Lieutenant Hunter was targeting him for discriminatory harassment.

85. Sergeant Tiederman then advised Officer Barberan that, per Lieutenant Hunter's orders, Officer Barberan would be obligated to write 15 traffic tickets per month.

86. Furthermore, Sergeant Tiederman, per Lieutenant Hunter's orders, removed Officer Barberan's discretion and instructed him to only issue citations for speeding or failing to stop at a stop sign.

87. Lt. Hunter prohibited Officer Barberan from issuing citations for other violations, including equipment violations and inspection violations.

88. This directive hampered Officer Barberan's ability to make narcotics arrests as such arrests often result from stopping cars for equipment violations.

89. Besides Officer Barberan, no other patrol officer has been ordered to satisfy a ticket quota.

90. In March 2016, Sergeant Flood issued Officer Barberan his 2015 annual performance evaluation, in which he expressed some concerns.

91. In response to the performance evaluation, Officer Barberan pointed out, as an initial matter, that Sergeant Flood was his supervisor for only a three-month period, and unqualified to evaluate him for the entire year.

92. Officer Barberan then disputed the alleged performance deficiencies through a letter from his Union.

93. Neither he nor the Union received a response to this letter.

94. Thereafter, Sergeant Flood was instructed by Lieutenant Hunter and/or Chief Bonci to modify his original evaluation to state that Officer Barberan was a cynical officer who did not bring joy to the Department.

95. Lieutenant Hunter and Chief Bonci then convened a meeting with Officer Barberan, during which he was shown the altered performance review, and told that he was the worst officer in the Department, that he was resistant to writing tickets, that he received one of the worst evaluations in the Department's history and that his attitude needed to change.

96. At this meeting, the departmental leaders again reminded Officer Barberan that they knew he had not grown up in Eastchester.

97. Following the evaluation, Lieutenant Hunter and Chief Bonci ordered Officer Barberan to attend further "remedial training," which included more ticket quotas.

98. The “remedial training”, held between May and September of 2016, required that Officer Barberan serve as vacation relief for one week per month.

99. At the time, Officer Barberan was working nights. Consequently, he had to switch back and forth between day shift and night shift each month. It is both physically and mentally taxing to switch between working days and nights.

100. Upon information and belief, no other officer has ever been ordered to work a rotating schedule of this nature during any significant period of time.

101. In June 2016, Lieutenant Hunter assigned Sergeant Joseph Groccia to evaluate Officer Barberan’s performance during his “remedial training.”

102. Sergeant Groccia had no idea why Officer Barberan was being placed in “remedial training” and received no instruction as to how he was supposed to be training him. The only guidance Sergeant Groccia received from Lieutenant Hunter was that he should report what Officer Barberan did wrong. When Sergeant Groccia asked what to do if Officer Barberan did something good, Lieutenant Hunter said that he did not care about anything positive – only negative.

103. Notwithstanding this directive, when Officer Barberan made an impressive arrest one day, Sergeant Groccia submitted a report stating that Officer Barberan had done an excellent job.

104. Lieutenant Hunter then called Sergeant Groccia into his office to reprimand him for violating a direct order (to only report what Officer Barberan did wrong) and threatened that he would bring Sergeant Groccia up on charges just like he was going to do for Officer Barberan.

105. Officer Barberan received no further evaluations from Sergeant Groccia, nor anyone else, during that “remedial training” period.

106. In September 2016, Officer Barberan's "remedial training" ended abruptly and he received no report, either oral or written, about what had been accomplished over the preceding four-month training period.

107. Officer Barberan's "remedial training" was stigmatizing, materially less prestigious, materially less suited to his skills and expertise, and materially less conducive to career advancement than his regular position.

108. In September 2016, recognizing the Department was grieving the death of a fellow officer, Lieutenant Hunter told everyone he was not expecting very many tickets to be issued that month.

109. Officer Barberan wrote 11 or 12 traffic tickets that month, which was consistent with the number written by the other officers within the Patrol Division.

110. Still, Lieutenant Hunter ordered Sergeant Conacchio to ride along with Officer Barberan, purportedly because his ticket numbers were low.

111. When Officer Barberan protested and asked why other patrolmen were not being accompanied by supervisors during their shifts, Sergeant Conacchio said that he had been instructed to speak only with Officer Barberan.

Disparate Treatment

112. Lieutenant Hunter's discriminatory bias has prevented him from recognizing Officer Barberan's positive contributions to the police force.

113. For example, on January 15, 2016, along with two other patrolmen, plaintiff performed life-saving measures on an officer from the Scarsdale Police Department.

114. Subsequently, when a few members of that department stopped by the Department headquarters to say thank you, in front of everyone, Lt. Hunter acknowledged the role of Officer Barberan's two colleagues in saving the officer's life but omitted any mention of Officer Barberan.

115. Furthermore, at the end of 2016, when Sergeant Groccia proposed that Officer Barberan receive an award for his actions on January 15, 2016, Lieutenant Hunter questioned Officer Barberan's involvement. Lieutenant Hunter then went around to various members of the Department asking whether Officer Barberan had actually contributed to the effort.

116. By comparison, Lieutenant Hunter did not question the involvement of the two other Caucasian officers nominated for the award.

117. These other officers were similarly situated to Officer Barberan because they were subject to the same performance evaluations, disciplinary standards, and supervision. However, these other officers were never criticized for (a) not speaking and acting in a stereotypically Caucasian manner, (b) having been born and raised in Yonkers, New York, (c) speaking the phrase "you know what I'm sayin'", (d) acting "ghetto", or (e) presenting themselves in a manner comparable to a black hip hop artist with no shirt, baggy pants hanging low, with underwear showing, dreadlocks, big chains, and a backwards hat. (Hereinafter, the attributes and behavior described in (a) through (e) are collectively referred to as "failing to conform to racial stereotypes").

118. Ultimately, despite Lieutenant Hunter's efforts, Officer Barberan did receive the award.

119. Similarly, Lieutenant Hunter unsuccessfully attempted to deny Officer Barberan an award for an impressive arrest he made on July 20, 2017, during the course of which he was injured.

120. Lieutenant Hunter has discouraged other officers from working night shift because there are fewer law enforcement activities at night, and therefore, fewer opportunities for development.

121. These officers were Caucasian and similarly situated to Officer Barberan because they were subject to the same performance evaluations, disciplinary standards, and supervision, except that they were never criticized for failing to conform to racial stereotypes. However, Lieutenant Hunter has refused Officer Barberan's repeated requests to be taken off nights and placed on the day shift.

122. In May 2018, another Department patrol officer, Rich Biagi, was involved in a fistfight at a local bar.

123. Officer Biagi is Caucasian and similarly situated to Officer Barberan in that he was subject to the same performance evaluations, disciplinary standards, and supervision, except that he was never criticized for failing to conform to his racial stereotypes.

124. While the Department was aware of the incident, Officer Biagi was not investigated. In fact, shortly thereafter, Officer Biagi was promoted to the rank of sergeant.

<u>Adverse Actions Suffered by Officer Barberan</u>

125. Lieutenant Hunter and Chief Bonci have denied Officer Barberan's other reasonable requests for training and special assignments.

126. In February 2018, Sergeant George Castellano suggested to Officer Barberan that he should apply for an undercover drug task force.

127. Sergeant Castellano believed that Officer Barberan would be an asset, and even helped with his application.

128. In addition, Sergeant Castellano's annual evaluation stated that Officer Barberan should be the next officer considered for the drug task force.

129. However, Lieutenant Hunter directed Sergeant Castellano to remove that aspect of the evaluation, per Chief Bonci's orders.

130. The assignment on the undercover drug task force would have been more distinguished and prestigious than plaintiff's present assignment, would have enabled Officer Barberan to gain skills and expertise, and would have furthered his career advancement.

131. In addition, this assignment is known to be a stepping-stone to a promotion to sergeant or detective.

132. Sergeants and detectives earn higher salaries than patrol officers.

133. Officer Barberan was one of four or five officers who applied for two spots on the drug task force.

134. Out of the applicants for the drug task force, Officer Barberan had the most experience with drug arrests and was the only applicant who had performed undercover work.

135. Officer Barberan had previously been assigned undercover assignments by then-Detective Richard Rosenberg; this assignment included buying narcotics from drug dealers.

136. During these undercover assignments, Officer Barberan was given Department money and a department telephone.

137. Officer Barberan fostered relationships with confidential informants and made successful undercover arrests.

138. In February 2018, Officer Barberan submitted his application for the drug task force.

139. On March 27, 2018, Officer Barberan received an email from the Department stating that Officer Chris Dura had been selected for the drug task force.

140. Later, in late March or April 2018, Officer John Yanni started working on the drug task force, without any announcements or explanation from the Department.

141. Officer Barberan was never provided with a reason why he had not been selected for the drug task force.

142. Defendants Hunter and Bonci selected Officers Dura and Yanni for the drug task force instead of Officer Barberan

143. Officers Dura and Yanni are both Caucasian and were similarly situated to Officer Barberan because they were subject to the same performance evaluations, disciplinary standards, and supervision, except that they were never criticized for failing to conform to their racial stereotypes.

144. In having been bypassed for the drug task force, Officer Barberan lost career advancement opportunities; was denied training that might have led to promotional opportunities; and was relegated to inferior and less desirable work duties.

145. Additionally, on multiple occasions, most recently in March or April of 2018, plaintiff requested assignment to the traffic car unit, which operates during the day.

146. The traffic car unit is more distinguished and prestigious, would have enabled Officer Barberan to gain skills and experience, and would have furthered his career advancement.

147. In addition, this assignment is a stepping-stone to promotion to sergeant or detective, as the officers there receive additional instruction in areas including bicycle patrol, sniper training, and field training officer (FTO) training.

148. Lieutenant Hunter and Chief Bonci have refused these requests. Instead, they have

assigned to the traffic car unit Officers Dura, Yanni, Timothy Bonci, Jr., John Park, and Nick Louros.

149. These officers are all Caucasian and were similarly situated to Officer Barberan because they were subject to the same performance evaluations, disciplinary standards, and supervision, except that they were never criticized for failing to conform to their racial stereotypes.

150. In having been bypassed for the traffic car unit, Officer Barberan lost career advancement opportunities; was denied training that might have led to promotional opportunities; and was relegated to inferior and less desirable work duties.

Additional Harassment of Officer Barberan for Failing to Conform to Racial Stereotypes

151. On June 8, 2018, the Department received a call from a woman claiming that Officer Barberan had threatened, harassed, and insulted her the previous day at the Montrose High School auditorium, while families were gathering prior to the senior prom.

152. Officer Barberan, who was off-duty and with his family at the auditorium, did have a conversation with this woman, but did not behave inappropriately towards her.

153. The woman declined to file an official civilian complaint against Officer Barberan.

154. However, Lieutenant Hunter repeatedly attempted to contact her to convince her to do so.

155. The Department's regulations require, and its practice has always been, that a formal complaint must be filed prior to the commencement of an investigation against an officer.

156. Notwithstanding the absence of any formal complaint, Lieutenant Hunter commenced an investigation of the allegations made by the woman during her informal call, and continued his investigation, even after she made clear that she would not be pursuing the matter further.

157. On June 24, 2018, Lieutenant Hunter even convened a formal investigatory meeting with the Department's internal affairs officer, Lieutenant Matthew Kiernan, which necessitated the presence of a union representative and union attorney for Officer Barberan.

158. The union requested that the matter be closed.

159. In an August 23, 2018 memo, Chief Bonci wrote that it could not be closed because no complaint had ever been filed. He further claimed, without authority from the Department rules and regulations, that the Department has an obligation to investigate the woman's allegations, notwithstanding the absence of a complaint.

160. He further maintained that "there is no disposition" to the matter, indicating that Lieutenant Hunter would be continuing to investigate the unsubstantiated allegation against Officer Barberan that had never been pursued by the original complaining party.

161. This is contrary to Department policies and practices.

162. No other officer has been subjected to an investigation like this without a formal complaint having been made.

Retaliation for Officer Barberan's Complaints of Discrimination

163. On August 28, 2018, Officer Barberan engaged in protected activity when his attorneys sent a letter to the Department, asserting claims for discrimination based on his failure to conform to racial stereotypes against the Department and Lieutenant Hunter.

164. Following receipt of this letter, the Department has treated Officer Barberan disparately than other police officers who are Caucasian and are similarly situated (because they are subject to the same performance evaluations, disciplinary standards, and supervision) except that they have not complained of discrimination and have never been criticized for failing to conform to their racial stereotypes.

165. In or around February or March 2018, prior to the August 28, 2018 protected activity, Officer Barberan had stated to Union President Casey that he would like to create and manage an Instagram account for the Department. Union President Casey informed Officer Barberan that Lt. Hunter would have to give permission for this activity.

166. Upon information and belief, Union President Casey asked Lieutenant Hunter whether Officer Barberan could create and manage an Instagram account for the Department.

167. In or around September 2018, following the August 28, 2018 protected activity, when the Department finally decided to act on Officer Barberan's suggestion and create and manage an Instagram account for the Department, Chief Bonci tasked Officer Louros, instead of Officer Barberan, with creating and maintaining an Instagram account for the Department.

168. Officer Louros is Caucasian and was similarly situated to Officer Barberan because he was subject to the same performance evaluations, disciplinary standards, and supervision, except that he had not complained about discrimination, and had never been criticized for failing to conform to his racial stereotypes.

169. Creating and maintaining the Instagram account for the Department would have enabled Officer Barberan to develop project management and communication skills, which would have improved his chances for advancement within the Department, with a corresponding increase in salary.

Additional Disparate Treatment

170. In or around mid-September 2018, Officer Barberan, while off-duty, was responsible for successfully pursuing a vehicle, and apprehending its intoxicated driver, who was wanted by other police departments. Officer Barberan's efforts led to an arrest of the suspect for

intoxicated driving and possession of narcotics. He received praise from the Westchester County Department of Public Safety and the New York State Police.

171. However, he received no recognition from the Department or Lieutenant Hunter.

172. In fact, at the biweekly Eastchester Town Board Meeting on September 18, 2018, Chief Bonci praised several of the Department's officers (who were Caucasian and similarly situated to Officer Barberan because they were subject to the same performance evaluations, disciplinary standards, and supervision, except that they had not complained about discrimination and had never been criticized for failing to conform to their racial stereotypes) for arrests that had taken place that month but did not mention Officer Barberan at all.

173. In October 2018, neither Officer Dura, nor any other officers who may have been assisting Officer Dura in securing a prisoner, were disciplined at all for their failure to obtain contraband from a prisoner prior to placing that prisoner in a cell. Officer Dura and the other officers are Caucasian and were similarly situated to Officer Barberan because they were subject to the same performance evaluations, disciplinary standards, and supervision, except that they had not complained about discrimination and had never been criticized for failing to conform to their racial stereotypes.

174. In October 2018, Officer Kyle Park engaged in a heated exchange with a citizen while working a "side job" in his police uniform but was not disciplined or investigated at all. Officer Park is Caucasian and was similarly situated to Officer Barberan because he was subject to the same performance evaluations, disciplinary standards, and supervision, except that he had not complained about discrimination and had never been criticized for failing to conform to his racial stereotypes.

175. In or around the end of October 2018 or early November 2018, a member of the public wrote a letter to the Department informing the Department that he had hired a private investigator to follow around several police officers known to go out drinking and then drive home from the local bar.

176. Upon information and belief, Lieutenant Kiernan was one of the officers named in that letter.

177. However, he has not been investigated by the Department.

178. Lieutenant Kiernan is Caucasian and similarly situated to Officer Barberan because he is subject to the same performance evaluations, disciplinary standards, and supervision, except that he has not complained about discrimination and has never been criticized for failing to conform to his racial stereotypes.

179. In October 2018, the Department failed to conduct any investigation at all into allegations brought by members of the Mount Vernon Police Department that Lieutenant Kiernan had improperly sought to influence one of their cases involving the fiancée of another Department police officer.

180. Officer Barberan has been denied recognition or awards for good performance; and he has been denied opportunities, including for programs he suggested.

181. In addition, other officers who have engaged in conduct similar to conduct for which Officer Barberan had been disciplined, investigated, or criticized in the past have not been disciplined, investigated, or criticized. These officers have all been Caucasian and similarly situated to Officer Barberan because they have been subject to the same performance evaluations, disciplinary standards, and supervision, except that they have not complained about discrimination and have never been criticized for failing to conform to their racial stereotypes.

Additional Retaliatory Harassment

182. In early 2018, prior to his protected activity on August 28, 2018, Officer Barberan had suggested at a union meeting that the Department participate in the national Coffee with a Cop Program, designed to foster better relationships between the Department and the community.

183. Upon information and belief, Lieutenant Hunter was aware that this was Officer Barberan's idea.

184. On October 3, 2018, following the August 28, 2018 protected activity, the Department finally acted on Officer Barberan's suggestion and held its first Coffee with a Cop event.

185. However, other police officers, including a new officer who had not attended training for the program, (all of whom are Caucasian and were similarly situated to Officer Barberan because they were subject to the same performance evaluations, disciplinary standards, and supervision, except they have not complained of discrimination and had never been criticized for failing to conform to their racial stereotypes) were sent to the event, instead of Officer Barberan.

186. Assignment to the Coffee with a Cop program would have allowed Officer Barberan to build relationships with the public, address community concerns, and develop leadership skills, all of which would have improved his chances for advancement within the Department, with a corresponding increase in salary.

187. In December 2018, Officer Barberan placed a small Christmas tree in the Department squad room.

188. Other officers (who are Caucasian and were similarly situated to Officer Barberan because they were subject to the same performance evaluations, disciplinary standards, and

supervision, except that they are had not complained about discrimination and had never been criticized for failing to conform to their racial stereotypes) this year and in previous years, were allowed to display Christmas-related paraphernalia in the squad room.

189. However, Officer Barberan's Christmas tree was thrown out by superior officers (who were aware of his protected activity) after three days.

190. In January 2019, shortly after Officer Barberan filed his charge of discrimination with the Equal Employment Opportunity Commission, Sergeant Biagi referred to Officer Barberan as a "rat" in front of other officers.

191. Thereafter, Sergeant Biagi was extremely hostile towards Officer Barberan. In particular, during the times that Sergeant Biagi has served as the desk sergeant, he has occasionally hung up on Officer Barberan when Officer Barberan has called with questions.

Additional Adverse Action Arising from both Discriminatory and Retaliatory Animus

192. On or around July 25, 2019, Officer Barberan, collectively with several other police officers, arrested a suspect, secured him, searched him, and placed him in a cell at the police station. It was later learned that contraband remained in the cell and was used by the prisoner.

193. Officer Barberan was the only police officer investigated and charged with misconduct relating to failing to discover the contraband. This includes Sergeant Justin Bernstein, who as the supervising officer, was ultimately responsible under Department rules and regulations for ensuring the safety of his officers and the prisoner.

194. All of the other officers involved in arresting, securing, and searching the suspect are Caucasian and were similarly situated to Officer Barberan because they were subject to the same performance evaluations, disciplinary standards, and supervision, except that they had not complained about discrimination and had never been criticized for failing to conform to their racial

stereotypes.

195. In September 2019, Chief Bonci initially charged Officer Barberan with three days of lost pay and two training days.

196. When Officer Barberan's union representative confronted Chief Bonci about the basis for the charges, Chief Bonci could not provide a reason why Officer Barberan was charged, but other police officers were not charged.

197. In October 2019, Chief Bonci ultimately agreed to reduce Officer Barberan's penalty down to three vacation days.

198. On January 9, 2021, plaintiff responded to a one vehicle accident on White Plains Road in the Town of Eastchester at about 1:42 a.m.

199. Plaintiff was one of two Town Police Officers dispatched to the scene of the accident.

200. The other police officer, Guerriero, was still on probation and had been out of the police academy for seven months and who had not been attacked as not conforming to stereotypes associated with Caucasian police officers or filed any charge of discrimination against the department, whether through the EEOC or otherwise.

201. At the scene, plaintiff and Guerriero drove police vehicles with video cameras designed to capture images in front of their cars and in the rear passenger compartment.

202. Guerriero arrived at the accident scene before plaintiff. He did not turn on his microphone when approaching the driver of the car.

203. Guerriero approached the car's driver as the latter man was going into his truck and retrieving a jacket.

204. The driver handed that jacket to the passenger in the car and plaintiff witnessed this conduct.

205. The driver then returned to the driver's side of the car, entered the vehicle and retrieved a satchel. Plaintiff also witnessed this.

206. From plaintiff's angle, it appeared as though the driver was hastily proceeding purposely or running to the driver side of the vehicle from the trunk of his car.

207. For the next two minutes, PO Guerriero interacted with the driver and passenger.

208. Plaintiff then approached the three and spoke with the driver and the other police officer.

209. During this time, the driver stepped away from the police officers and began pacing.

210. The discussion which proceeded this pacing was not recorded by either police officer at the scene.

211. The driver walked away from the police officers while they were investigating his activities preceding his car accident.

212. The driver appeared to be nervous, remote and under the influence of a mind-altering substance. His answers made no sense.

213. The driver refused to follow commands being given by the officers and would not remain in place.

214. Plaintiff drew his taser to gain control of the situation with an erratic suspect who was not following commands.

215. The driver had reached into the car as plaintiff was approaching and took a satchel.

216. Plaintiff was suspicious as to why the driver had reached into his vehicle and grabbed this object as the police were approaching.

217. Plaintiff saw an object which be believed to be a hypodermic needle sticking out of the satchel.

218. Plaintiff determined that he had probable cause to arrest the driver for driving under the influence and that he search the satchel incident to an arrest based upon numerous factors, including the nature of the motor vehicle accident, the driver's presentation, and the driver's conduct and what appeared to be a needle in the bag.

219. At the scene and before placing the driver in the back of his police vehicle, plaintiff performed a pat down for weapons and found no weapons.

220. Plaintiff anticipated that he would perform a more thorough pat down at the station.

221. However, once at the station with the driver, the sergeant in charge of the shift assigned the primary responsibility for the arrestee's processing to PO Guerriero.

222. At the station, PO Guerreiro was tasked with searching the driver and preparing the paperwork incident to the arrest, proof that he was deemed the arresting officer.

223. P.O. Guerreiro was responsible for insuring the proper station house search of the detainee.

224. Despite his not so proceeding, PO Guerreiro was not charged with any violation of departmental policy.

225. At the departmental hearing in this matter, defendant did not call as witnesses PO Guerreiro or Sgt. Castellano, who was in charge of the shift that evening.

226. Instead, the defendant village called an expert in police practices, something never before done during any disciplinary hearing, and a lieutenant who had no first-hand knowledge of the incident and was assigned to investigate it.

227. For the disciplinary hearing, defendant Town appointed as its hearing officer Robert Ponzini, Esq., who numerous towns and villages in Westchester use for this purpose and who has a reputation for rendering decisions desired by the appointing municipalities and ver rarely siding with the line officer.

228. Allegedly on the basis of conclusions of law reached by Ponzini, defendant terminated plaintiff's employment on November 16, 2021.

229. Said termination was for trivial offenses which, when engaged in by other officers, have not even caused the institution of disciplinary proceedings.

230. In this instance, PO Guerrero failed to properly search the detainee and after his alleged search, pills were found in the latter's possession.

231. Defendants did not bring PO Guerriero up on any charges.

232. Likewise, Eastchester police officers frequently deploy tasers to defuse tense events and are not encouraged to use physical force, sometimes referred to as soft hands, before doing so.

233. In this instance, use of the taser as a deterrent caused the detainee to desist from his oppositional conduct and to cooperate with plaintiff.

234. Likewise, police officers routinely make arrests for driving while impaired based upon their evaluation of the totality of the presenting situation and the department has never before taken the position that such an arrest lacked probable cause or provided an insufficient basis for the search of a bag or satchel that the arrestee specifically placed in his own possession in the presence of its police officers.

**AS AND FOR A FIRST CAUSE OF ACTION**
***(Discrimination in Violation of Title VII)***
**Brought against the Town**

235. Plaintiff repeats and realleges the allegations contained in paragraphs "1" through "234" of the Amended Complaint as if set forth fully herein.

236. Officer Barberan is a member of a protected class because he is Hispanic.

237. Officer Barberan was and is qualified for his position as a patrol officer, as he has performed his law enforcement duties well, has received generally positive evaluations, and is well-respected by his fellow patrolmen, and most of his supervisory officers.

238. Officer Barberan suffered adverse actions in that he was denied assignments to the traffic car unit in March or April 2018, and to the drug task force in March or April 2018, was disciplined for alleged misconduct in October 2019 and was terminated in November 2021.

239. As a result of these adverse actions, Officer Barberan lost vacation days, career

advancement opportunities, was relegated to inferior and less desirable work duties, and was denied training that might have led to promotional opportunities to, for example, sergeant or detective. Ultimately, defendant Town terminated his employment

240. These adverse actions occurred under circumstances giving rise to an inference of discrimination insofar as these decisions were made by Chief Bonci and Lieutenant Hunter, who harbored discriminatory animus toward Officer Barberan, as evidenced by his various comments and actions commencing in 2014, criticizing Barberan's appearance and manner of speaking as being more consistent with the appearance and manner of speaking of a black police officer than a Caucasian police officer.

241. Namely, Lieutenant Hunter showed Officer Barberan a video of a black hip hop artist with no shirt, baggy pants hanging low, with underwear showing, dreadlocks, big chains, and a backwards hat, and laughed as he explained that this was how Officer Barberan was presenting himself. He further commented in reference to this video that "Your attitude and ways are not how I want my officers to look and act."

242. Lieutenant Hunter also scolded Officer Barberan for using the phrase "you know what I'm sayin'" (a phrase generally associated with stereotypes of black speech) and instructed him to speak "properly."

243. Lieutenant Hunter also (a) advised Officer Barberan that being raised in Yonkers "wasn't the best approach", and that they do things differently in Eastchester; (b) expressed that he knew Officer Barberan was from Yonkers and said "Your Yonkers ghetto doesn't add up to my Eastchester professional"; (c) when assigning Officer Barberan purported "remedial training," sarcastically said "this is how Yonkers trains its men"; and (d) reminded Officer Barberan during a performance review that he was aware Officer Barberan had not grown up in Eastchester.

244. Yonkers is a substantially more diverse municipality than the Town of Eastchester.

245. In fact, according to the U.S. Census Bureau, the July 1, 2019 estimated Black population of Yonkers was 18.4%, while the estimated Black population of the Town was 1.9%.

246. The phrase "ghetto" is associated with negative stereotypes of Black culture.

247. These adverse actions also occurred under circumstances giving rise to an inference of discrimination insofar as Officer Barberan was treated differently than other officers who were Caucasian and similarly situated to Officer Barberan (because they were subject to the same performance evaluations, disciplinary standards, and supervision) except that they were never criticized for failing to conform to their racial stereotypes.

248. In addition to having been denied assignments to the traffic car unit in March or April of 2018, and to the drug task force in March or April 2018, and having been disciplined for alleged misconduct in October 2019 and terminated in November 2021, Officer Barberan also suffered additional adverse actions commencing in 2014 that are continuing violations.

**AS AND FOR A SECOND CAUSE OF ACTION**
***(Retaliation in Violation of Title VII)***
**<u>Brought against the Town</u>**

249. Plaintiff repeats and realleges the allegations contained in paragraphs "1" through "248" of the Amended Complaint as if set forth fully herein.

250. Officer Barberan engaged in protected activity by complaining about discrimination through his former attorneys' August 28, 2018 letter to the Department complaining of discrimination for failure to conform to racial stereotypes.

251. The Town retaliated against Officer Barberan by (a) failing to recognize Officer Barberan's contributions to a significant arrest in or around September 2018 while recognizing other police officers, (b) refusing to allow Officer Barberan to participate in the Coffee with a Cop

Program beginning October 3, 2018, which was his idea, while allowing other police officers to participate, (c) denying Officer Barberan the opportunity to manage the Department's Instagram account in or around September 2018, while allowing other police officers to do so, (d) removing Officer Barberan's Christmas tree from the Department's squad room, while allowing other police officers to display holiday decorations, (e) disciplining Officer Barberan for alleged misconduct in October 2019, while failing to investigate or discipline any of the several other police officers involved in the underlying incident and (f) terminating plaintiff in November 2021 for actions and omissions far less serious than those overlooked when engaged in by non-Hispanic officers and officers not accused of failing to meet stereotypic behavior expected of Caucasian officers.

252. All of these police officers treated differently than Officer Barberan were similarly situated to Officer Barberan because they were subject to the same performance evaluations, disciplinary standards, and supervision, except that they had not complained about discrimination.

253. These adverse actions occurred close in time after Officer Barberan's protected activity.

254. These adverse actions taken against Officer Barberan affected his career and his opportunities for experience and advancement and would likely have deterred a reasonable person from engaging in protected activity.

255. These adverse actions would have not occurred in the absence of Officer Barberan's protected activity.

**AS AND FOR A THIRD CAUSE OF ACTION**
***(Discrimination in Violation of Section 1983)***
**Brought Against the Town, Chief Bonci, in his Official Capacity, and Lieutenant Hunter, in his Official Capacity**

256. Plaintiff repeats and realleges the allegations contained in paragraphs "1" through "255" of the Amended Complaint as if set forth fully herein.

257. Officer Barberan is a member of a protected class because he is Hispanic.

258. Officer Barberan was and is qualified for his position as a patrol officer, as he has performed his law enforcement duties well, has received generally positive evaluations, and is well-respected by his fellow patrolmen, and most of his supervisory officers.

259. Officer Barberan's Constitutional rights were violated because he was denied equal protection under the Fourteenth Amendment to the United State Constitution insofar as he suffered adverse actions based upon his failure to conform to racial stereotypes.

260. Officer Barberan suffered adverse actions in that he was denied assignments to the traffic car unit in March or April of 2018, and to the drug task force in March or April of 2018, was disciplined for alleged misconduct in October 2019 and was terminated in November 2021.

261. As a result of these adverse actions, Officer Barberan lost vacation days, career advancement opportunities, was relegated to inferior and less desirable work duties, and was denied training that might have led to promotional opportunities to, for example, sergeant or detective and ultimately terminated.

262. These adverse actions occurred under circumstances giving rise to an inference of discrimination insofar as these decisions were made by Chief Bonci and Lieutenant Hunter, who harbored discriminatory animus toward Officer Barberan, as evidenced by his various comments and actions commencing in 2014, criticizing Barberan's appearance and manner of speaking as being more consistent with the appearance and manner of speaking of a black police officer than a Caucasian police officer.

263. Namely, Lieutenant Hunter showed Officer Barberan a video of a black hip hop artist with no shirt, baggy pants hanging low, with underwear showing, dreadlocks, big chains, and a backwards hat, and laughed as he explained that this was how Officer Barberan was presenting

himself. He further commented in reference to this video that "Your attitude and ways are not how I want my officers to look and act."

264. Lieutenant Hunter also scolded Officer Barberan for using the phrase "you know what I'm sayin'" (a phrase generally associated with stereotypes of black speech) and instructed him to speak "properly."

265. Lieutenant Hunter also (a) advised Officer Barberan that being raised in Yonkers "wasn't the best approach", and that they do things differently in Eastchester; (b) expressed that he knew Officer Barberan was from Yonkers and said "Your Yonkers ghetto doesn't add up to my Eastchester professional"; (c) when assigning Officer Barberan purported "remedial training," sarcastically said "this is how Yonkers trains its men"; and (d) reminded Officer Barberan during a performance review that he was aware Officer Barberan had not grown up in Eastchester.

266. Yonkers is a substantially more diverse municipality than the Town. In fact, according to the U.S. Census Bureau, the July 1, 2019 estimated Black population of Yonkers was 18.4%, while the estimated Black population of the Town was 1.9%.

267. The phrase "ghetto" is associated with negative stereotypes of Black culture.

268. These adverse actions also occurred under circumstances giving rise to an inference of discrimination insofar as Officer Barberan was treated differently than other officers who are Caucasian and were similarly situated to Officer Barberan (because they were subject to the same performance evaluations, disciplinary standards, and supervision) except that they were never criticized for failing to conform to their racial stereotypes.

269. In addition to having been denied assignments to the traffic car unit in March or April of 2018, and to the drug task force in March or April of 2018, and having been disciplined for alleged misconduct in October 2019, Officer Barberan also suffered additional adverse actions

commencing in 2014 that are continuing violations.

270. Chief Bonci has final authority over the operation of the Department, including but not limited to, assignments of personnel, discipline, and training, and he exercised his discretion to take these adverse actions against Officer Barberan.

271. As an official with final authority over significant matters involving the exercise of discretion, Chief Bonci's adverse actions taken against Officer Barberan constitute official policy, custom, pattern or practice of the Town.

272. In addition, Lieutenant Hunter had final authority over the operation of the patrol officers, including but not limited to, assignments of personnel, discipline, and training, and he exercised his discretion to take these adverse actions against Officer Barberan.

273. As an official with final authority over significant matters involving the exercise of discretion, Lieutenant Hunter's adverse actions taken against Officer Barberan constitute official policy, custom, pattern or practice of the Town.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**(*Retaliation in Violation of Section 1983*)**
**Brought Against the Town, Chief Bonci, in his Official Capacity, and Lieutenant Hunter, in his Official Capacity**

274. Plaintiff repeats and realleges the allegations contained in paragraphs "1" through "273" of the Amended Complaint as if set forth fully herein.

275. Officer Barberan's Constitutional rights were violated because he was denied equal protection under the Fourteenth Amendment to the United State Constitution insofar as he was retaliated against for complaining that he had suffered adverse actions based upon his failure to conform to racial stereotypes.

276. Officer Barberan engaged in protected activity by complaining about discrimination through his attorneys' August 28, 2018 letter to the Department complaining of

discrimination for failure to conform to racial stereotypes.

277. The Town, Chief Bonci, in his Official Capacity, and Lieutenant Hunter, in his Official Capacity, retaliated against Officer Barberan by (a) failing to recognize Officer Barberan's contributions to a significant arrest in or around September 2018 while recognizing other police officers, (b) refusing to allow Officer Barberan to participate in the Coffee with a Cop Program beginning October 3, 2018, which was his idea, while allowing other police officers to participate, (c) denying Officer Barberan the opportunity to manage the Department's Instagram account in or around September 2018, while allowing other police officers to do so, (d) removing Officer Barberan's Christmas tree from the Department's squad room, while allowing other police officers to display holiday decorations, and (e) disciplining Officer Barberan for alleged misconduct in October 2019, while failing to investigate or discipline any of the several other police officers involved in the underlying incident.

278. All of these police officers treated differently than Officer Barberan were similarly situated to Officer Barberan because they were subject to the same performance evaluations, disciplinary standards, and supervision, except that they had not complained about discrimination.

279. These adverse actions occurred close in time after Officer Barberan's protected activity.

280. These adverse actions taken against Officer Barberan affected his career and his opportunities for experience and advancement, and would likely have deterred a reasonable person from engaging in protected activity.

281. These adverse actions would have not occurred in the absence of Officer Barberan's protected activity.

282. Chief Bonci has final authority over the operation of the Department, including but

not limited to, assignments of personnel, discipline, and training, and he exercised his discretion to take these adverse actions against Officer Barberan.

283. As an official with final authority over significant matters involving the exercise of discretion, Chief Bonci's adverse actions taken against Officer Barberan constitute official policy, custom, pattern or practice of the Town.

284. In addition, Lieutenant Hunter had final authority over the operation of the patrol officers, including but not limited to, assignments of personnel, discipline, and training, and he exercised his discretion to take these adverse actions taken against Officer Barberan.

285. As an official with final authority over significant matters involving the exercise of discretion, Lieutenant Hunter's adverse actions taken against Officer Barberan constitute official policy, custom, pattern, or practice of the Town.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**(*Discrimination in Violation of Section 1983*)**
**Brought Against Chief Bonci and Lieutenant Hunter, in Their Individual Capacities**

286. Plaintiff repeats and realleges the allegations contained in paragraphs "1" through "285" of the Amended Complaint as if set forth fully herein.

287. Officer Barberan is a member of a protected class because he is Hispanic.

288. Officer Barberan was and is qualified for his position as a patrol officer, as he has performed his law enforcement duties well, has received generally positive evaluations, and is well-respected by his fellow patrolmen, and most of his supervisory officers.

289. Officer Barberan's Constitutional rights were violated because he was denied equal protection under the Fourteenth Amendment to the United State Constitution insofar as he suffered adverse actions based upon his failure to conform to racial stereotypes.

290. Officer Barberan suffered adverse actions in that he was denied assignments to the

traffic car unit in March or April of 2018, and to the drug task force in March or April of 2018, was disciplined for alleged misconduct in October 2019 and was terminated in November 2021.

291. As a result of these adverse actions, Officer Barberan lost his job and the benefits associated therewith after having been deprived of vacation days, career advancement opportunities and being relegated to inferior and less desirable work duties and denied training that might have led to promotional opportunities to, for example, sergeant or detective.

292. These adverse actions occurred under circumstances giving rise to an inference of discrimination insofar as these decisions were made by Chief Bonci and Lieutenant Hunter, who harbored discriminatory animus toward Officer Barberan, as evidenced by his various comments and actions commencing in 2014, criticizing Barberan's appearance and manner of speaking as being more consistent with the appearance and manner of speaking of a black police officer than a Caucasian police officer.

293. Namely, Lieutenant Hunter showed Officer Barberan a video of a black hip hop artist with no shirt, baggy pants hanging low, with underwear showing, dreadlocks, big chains, and a backwards hat, and laughed as he explained that this was how Officer Barberan was presenting himself. He further commented in reference to this video that "Your attitude and ways are not how I want my officers to look and act."

294. Lieutenant Hunter also scolded Officer Barberan for using the phrase "you know what I'm sayin'" (a phrase generally associated with stereotypes of black speech) and instructed him to speak "properly."

295. Lieutenant Hunter also (a) advised Officer Barberan that being raised in Yonkers "wasn't the best approach", and that they do things differently in Eastchester; (b) expressed that he knew Officer Barberan was from Yonkers and said "Your Yonkers ghetto doesn't add up to my

Eastchester professional"; (c) when assigning Officer Barberan purported "remedial training," sarcastically said "this is how Yonkers trains its men"; and (d) reminded Officer Barberan during a performance review that he was aware Officer Barberan had not grown up in Eastchester.

296. Yonkers is a substantially more diverse municipality than the Town. In fact, according to the U.S. Census Bureau, the July 1, 2019 estimated Black population of Yonkers was 18.4%, while the estimated Black population of the Town was 1.9%.

297. The phrase "ghetto" is associated with negative stereotypes of Black culture.

298. These adverse actions also occurred under circumstances giving rise to an inference of discrimination insofar as Officer Barberan was treated differently than other officers who are Caucasian and were similarly situated to Officer Barberan (because they were subject to the same performance evaluations, disciplinary standards, and supervision) except that they were never criticized for failing to conform to their racial stereotypes.

299. In addition to having been denied assignments to the traffic car unit in March or April of 2018, and to the drug task force in March or April of 2018, and having been disciplined for alleged misconduct in October 2019, Officer Barberan also suffered additional adverse actions commencing in 2014 that are continuing violations.

300. Chief Bonci has final authority over the operation of the Department, including but not limited to, assignments of personnel, discipline, and training, and he exercised his discretion to take these adverse actions against Officer Barberan.

301. As an official with final authority over significant matters involving the exercise of discretion, Chief Bonci's adverse actions taken against Officer Barberan constitute official policy, custom, pattern or practice of the Town.

302. In addition, Lieutenant Hunter had final authority over the operation of the patrol

officers, including but not limited to, assignments of personnel, discipline, and training, and he exercised his discretion to take these adverse actions against Officer Barberan.

303. As an official with final authority over significant matters involving the exercise of discretion, Lieutenant Hunter's adverse actions taken against Officer Barberan constitute official policy, custom, pattern or practice of the Town.

304. Chief Bonci is individually liable under Section 1983 because he was personally involved in taking these adverse actions against Officer Barberan.

305. Lieutenant Hunter is individually liable under Section 1983 because he was personally involved in taking these adverse actions against Officer Barberan.

**AS AND FOR AN SIXTH CAUSE OF ACTION**
**(*Retaliation in Violation of Section 1983*)**
**Brought Against Chief Bonci and Lieutenant Hunter, In Their Individual Capacities**

306. Plaintiff repeats and realleges the allegations contained in paragraphs "1" through "305" of the Amended Complaint as if set forth fully herein.

307. Officer Barberan's Constitutional rights were violated because he was denied equal protection under the Fourteenth Amendment to the United State Constitution insofar as he was retaliated against for complaining that he had suffered adverse actions based upon his failure to conform to racial stereotypes.

308. Officer Barberan engaged in protected activity by complaining about discrimination through his attorneys' August 28, 2018 letter to the Department complaining of discrimination for failure to conform to racial stereotypes.

309. Chief Bonci and Lieutenant Hunter retaliated against Officer Barberan by (a) failing to recognize Officer Barberan's contributions to a significant arrest in or around September 2018 while recognizing other police officers, (b) refusing to allow Officer Barberan to participate in the

Coffee with a Cop Program beginning October 3, 2018, which was his idea, while allowing other police officers to participate, (c) denying Officer Barberan the opportunity to manage the Department's Instagram account in or around September 2018, while allowing other police officers to do so, (d) removing Officer Barberan's Christmas tree from the Department's squad room, while allowing other police officers to display holiday decorations, (e) disciplining Officer Barberan for alleged misconduct in October 2019, while failing to investigate or discipline any of the several other police officers involved in the underlying incident and (f) terminating plaintiff while failing to discipline another officer involved in the underlying incident and failing to like discipline other officers involved in objectively far more serious derelictions of duty.

310. All of these police officers treated differently than Officer Barberan were similarly situated to Officer Barberan because they were subject to the same performance evaluations, disciplinary standards, and supervision, except that they had not complained about discrimination.

311. These adverse actions occurred close in time after Officer Barberan's protected activity.

312. These adverse actions taken against Officer Barberan affected his career and his opportunities for experience and advancement and would likely have deterred a reasonable person from engaging in protected activity.

313. These adverse actions would have not occurred in the absence of Officer Barberan's protected activity.

314. Chief Bonci has final authority over the operation of the Department, including but not limited to, assignments of personnel, discipline, and training, and he exercised his discretion to take these adverse actions against Officer Barberan.

315. As an official with final authority over significant matters involving the exercise of

discretion, Chief Bonci's adverse actions taken against Officer Barberan constitute official policy, custom, pattern or practice of the Town.

316. In addition, Lieutenant Hunter had final authority over the operation of the patrol officers, including but not limited to, assignments of personnel, discipline, and training, and he exercised his discretion to take these adverse actions against Officer Barberan.

317. As an official with final authority over significant matters involving the exercise of discretion, Lieutenant Hunter's adverse actions taken against Officer Barberan constitute official policy, custom, pattern or practice of the Town.

318. Chief Bonci is individually liable under Section 1983 because he was personally involved in taking these adverse actions against Officer Barberan.

319. Lieutenant Hunter is individually liable under Section 1983 because he was personally involved in taking these adverse actions against Officer Barberan.

## XV. AS AND FOR AN SEVENTH CAUSE OF ACTION
## (*Discrimination in Violation of the NYSHRL*)
## <u>Brought Against the Town</u>

320. Plaintiff repeats and realleges the allegations contained in paragraphs "1" through "319" of the Amended Complaint as if set forth fully herein.

321. Officer Barberan is a member of a protected class because he is Hispanic.

322. Officer Barberan was and is qualified for his position as a patrol officer, as he has performed his law enforcement duties well, has received generally positive evaluations, and is well-respected by his fellow patrolmen, and most of his supervisory officers.

323. Officer Barberan suffered adverse actions in that he was denied assignments to the traffic car unit in March or April of 2018, and to the drug task force in March or April 2018, and was disciplined for alleged misconduct in October 2019.

324. As a result of these adverse actions, Officer Barberan lost vacation days, career advancement opportunities, was relegated to inferior and less desirable work duties, and was denied training that might have led to promotional opportunities to, for example, sergeant or detective.

325. These adverse actions occurred under circumstances giving rise to an inference of discrimination insofar as these decisions were made by Chief Bonci and Lieutenant Hunter, who harbored discriminatory animus toward Officer Barberan, as evidenced by his various comments and actions commencing in 2014, criticizing Barberan's appearance and manner of speaking as being more consistent with the appearance and manner of speaking of a black police officer than a Caucasian police officer.

326. Namely, Lieutenant Hunter showed Officer Barberan a video of a black hip hop artist with no shirt, baggy pants hanging low, with underwear showing, dreadlocks, big chains, and a backwards hat, and laughed as he explained that this was how Officer Barberan was presenting himself. He further commented in reference to this video that "Your attitude and ways are not how I want my officers to look and act."

327. Lieutenant Hunter also scolded Officer Barberan for using the phrase "you know what I'm sayin'" (a phrase generally associated with stereotypes of black speech) and instructed him to speak "properly."

328. Lieutenant Hunter also (a) advised Officer Barberan that being raised in Yonkers "wasn't the best approach", and that they do things differently in Eastchester; (b) expressed that he knew Officer Barberan was from Yonkers and said "Your Yonkers ghetto doesn't add up to my Eastchester professional"; (c) when assigning Officer Barberan purported "remedial training,"

sarcastically said "this is how Yonkers trains its men"; and (d) reminded Officer Barberan during a performance review that he was aware Officer Barberan had not grown up in Eastchester.

329. Yonkers is a substantially more diverse municipality than the Town. In fact, according to the U.S. Census Bureau, the July 1, 2019 estimated Black population of Yonkers was 18.4%, while the estimated Black population of the Town was 1.9%.

330. The phrase "ghetto" is associated with negative stereotypes of Black culture.

331. These adverse actions also occurred under circumstances giving rise to an inference of discrimination insofar as Officer Barberan was treated differently than other officers who were similarly situated to Officer Barberan because they were subject to the same performance evaluations, disciplinary standards, and supervision, except that they were never criticized for failing to conform to racial stereotypes.

332. In addition to having been denied assignments to the traffic car unit in March or April of 2018, and to the drug task force in March or April of 2018, having been disciplined for alleged misconduct in October 2019, having been terminated in November 2021, Officer Barberan also suffered additional adverse actions commencing in 2014 that are continuing violations.

**AS AND FOR A EIGHT CAUSE OF ACTION**
***(Retaliation in Violation of the NYSHRL)***
**Brought Against the Town**

333. Plaintiff repeats and realleges the allegations contained in paragraphs "1" through "332" of the Amended Complaint as if set forth fully herein.

334. Officer Barberan engaged in protected activity by complaining about discrimination through his attorneys' August 28, 2018 letter to the Department complaining of discrimination for failure to conform to racial stereotypes.

335. The Town retaliated against Officer Barberan by (a) failing to recognize Officer

Barberan's contributions to a significant arrest in or around September 2018 while recognizing other police officers, (b) refusing to allow Officer Barberan to participate in the Coffee with a Cop Program beginning October 3, 2018, which was his idea, while allowing other police officers to participate, (c) denying Officer Barberan the opportunity to manage the Department's Instagram account in or around September 2018, while allowing other police officers to do so, (d) removing Officer Barberan's Christmas tree from the Department's squad room, while allowing other police officers to display holiday decorations, (e) disciplining Officer Barberan for alleged misconduct in October 2019, while failing to investigate or discipline any of the several other police officers involved in the underlying incident and terminating plaintiff in November 2021 while failing to discipline another officer involved in the underlying incident and failing to like discipline other officers involved in objectively far more serious derelictions of duty.

336. All of these police officers treated differently than Officer Barberan were similarly situated to Officer Barberan because they were subject to the same performance evaluations, disciplinary standards, and supervision, except that they had not complained about discrimination.

337. These adverse actions occurred close in time after Officer Barberan's protected activity.

338. These adverse actions taken against Officer Barberan affected his career and his opportunities for experience and advancement and would likely have deterred a reasonable person from engaging in protected activity.

339. These adverse actions would have not occurred in the absence of Officer Barberan's protected activity.

**AS AND FOR A NINTH CAUSE OF ACTION**
**(*Discrimination in Violation of the NYSHRL*)**

**Brought Against Chief Bonci and Lieutenant Hunter**

340. Plaintiff repeats and realleges the allegations contained in paragraphs "1" through "336" of the Amended Complaint as if set forth fully herein.

341. Officer Barberan is a member of a protected class because he is Hispanic.

342. Officer Barberan was and is qualified for his position as a patrol officer, as he has performed his law enforcement duties well, has received generally positive evaluations, and is well-respected by his fellow patrolmen, and most of his supervisory officers.

343. Officer Barberan suffered adverse actions in that he was denied assignments to the traffic car unit in March or April of 2018, and to the drug task force in March or April 2018, and was disciplined for alleged misconduct in October 2019.

344. As a result of these adverse actions, Officer Barberan lost vacation days, career advancement opportunities, was relegated to inferior and less desirable work duties, and was denied training that might have led to promotional opportunities to, for example, sergeant or detective. Sergeants and detectives earn higher salaries than patrol officers.

345. These adverse actions occurred under circumstances giving rise to an inference of discrimination insofar as these decisions were made by Chief Bonci and Lieutenant Hunter, who harbored discriminatory animus toward Officer Barberan, as evidenced by his various comments and actions commencing in 2014, criticizing Barberan's appearance and manner of speaking as being more consistent with the appearance and manner of speaking of a black police officer than a Caucasian police officer.

346. Namely, Lieutenant Hunter showed Officer Barberan a video of a black hip hop artist with no shirt, baggy pants hanging low, with underwear showing, dreadlocks, big chains, and a backwards hat, and laughed as he explained that this was how Officer Barberan was presenting

himself. He further commented in reference to this video that "Your attitude and ways are not how I want my officers to look and act."

347. Lieutenant Hunter also scolded Officer Barberan for using the phrase "you know what I'm sayin'" (a phrase generally associated with stereotypes of black speech) and instructed him to speak "properly."

348. Lieutenant Hunter also (a) advised Officer Barberan that being raised in Yonkers "wasn't the best approach", and that they do things differently in Eastchester; (b) expressed that he knew Officer Barberan was from Yonkers and said "Your Yonkers ghetto doesn't add up to my Eastchester professional"; (c) when assigning Officer Barberan purported "remedial training," sarcastically said "this is how Yonkers trains its men"; and (d) reminded Officer Barberan during a performance review that he was aware Officer Barberan had not grown up in Eastchester.

349. Yonkers is a substantially more diverse municipality than the Town. In fact, according to the U.S. Census Bureau, the July 1, 2019 estimated Black population of Yonkers was 18.4%, while the estimated Black population of the Town was 1.9%.

350. The phrase "ghetto" is associated with negative stereotypes of Black culture.

351. These adverse actions also occurred under circumstances giving rise to an inference of discrimination insofar as Officer Barberan was treated differently than other officers who were similarly situated to Officer Barberan because they were subject to the same performance evaluations, disciplinary standards, and supervision, except that they were never criticized for failing to conform to racial stereotypes.

352. In addition to having been denied assignments to the traffic car unit in March or April of 2018, and to the drug task force in March or April of 2018, having been disciplined for alleged misconduct in October 2019 and terminating plaintiff while failing to discipline another

officer involved in the underlying incident and failing to like discipline other officers involved in objectively far more serious derelictions of duty.

353. Officer Barberan also suffered additional adverse actions commencing in 2014 that are continuing violations.

354. Chief Bonci is liable as an employer under the NYSHRL because he has the authority to hire and fire police officers.

355. Chief Bonci is also liable as an aider and abettor under the NYSHRL because he participated directly in these adverse actions.

356. Lieutenant Hunter is liable as an aider and abettor under the NYSHRL because he participated directly in these adverse actions.

**AS AND FOR A TENTH CAUSE OF ACTION**
**(*Retaliation in Violation of the NYSHRL*)**
**Brought Against Chief Bonci and Lieutenant Hunter**

357. Plaintiff repeats and realleges the allegations contained in paragraphs "1" through "352" of the Amended Complaint as if set forth fully herein.

358. Officer Barberan engaged in protected activity by complaining about discrimination through his attorneys' August 28, 2018 letter to the Department complaining of discrimination for failure to conform to racial stereotypes.

359. Chief Bonci and Lieutenant Hunter retaliated against Officer Barberan by (a) failing to recognize Officer Barberan's contributions to a significant arrest in or around September 2018 while recognizing other police officers, (b) refusing to allow Officer Barberan to participate in the Coffee with a Cop Program beginning October 3, 2018, which was his idea, while allowing other police officers to participate, (c) denying Officer Barberan the opportunity to manage the Department's Instagram account in or around September 2018, while allowing other police officers

to do so, (d) removing Officer Barberan's Christmas tree from the Department's squad room, while allowing other police officers to display holiday decorations, (e) disciplining Officer Barberan for alleged misconduct in October 2019, while failing to investigate or discipline any of the several other police officers involved in the underlying incident and terminating plaintiff while failing to discipline another officer involved in the underlying incident and failing to like discipline other officers involved in objectively far more serious derelictions of duty.

360. All of these police officers treated differently than Officer Barberan were similarly situated to Officer Barberan because they were subject to the same performance evaluations, disciplinary standards, and supervision, except that they had not complained about discrimination.

361. These adverse actions occurred close in time after Officer Barberan's protected activity.

362. These adverse actions taken against Officer Barberan affected his career and his opportunities for experience and advancement and would likely have deterred a reasonable person from engaging in protected activity.

363. These adverse actions would have not occurred in the absence of Officer Barberan's protected activity.

364. Chief Bonci is liable as an employer under the NYSHRL because he has the authority to hire and fire police officers.

365. Chief Bonci is also liable as an aider and abettor under the NYSHRL because he participated directly in these adverse actions

366. Lieutenant Hunter is liable as an aider and abettor under the NYSHRL because he participated directly in these adverse actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Reinstate plaintiff to his position with back pay and benefits;

B. Issue an injunction to restrain the Town, Chief Bonci, and Lieutenant Hunter from continued violations of Section 1983, and the NYSHRL;

C. Enter a judgment declaring that Plaintiff has been discriminated against on the basis of his failure to conform to racial stereotypes in violation of Title VII, Section 1983, and the NYSHRL;

D. Enter a judgment declaring that Plaintiff has been retaliated against for complaining of discrimination in violation of Title VII, Section 1983, and the NYSHRL;

E. Award Plaintiff lost wages, benefits, damages for emotional distress, punitive damages as to the individual defendants, and other remuneration in an amount to be determined at trial;

F. Award Plaintiff the costs of this action, together with his reasonable attorneys' fees, and pre-judgment interest; and

G. Grant Plaintiff such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury with respect to all issues and claims properly before a jury.

Dated: October 7, 2022,
Goshen, New York

SUSSMAN & ASSOCIATES

By: MICHAEL H. SUSSMAN [3497]
Attorney for Plaintiff
1 Railroad Avenue
Goshen, New York 10924
(845) 294-3991