**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ X

ANTHONY BARBERAN,

                                Plaintiff,

              - against –

TOWN OF EASTCHESTER, TIMOTHY BONCI,
JEFFREY HUNTER,

                             Defendants.

------------------------------------------------------------------ X

19-CV-10983 (VR)

**NOTICE OF APPEAL**

      **PLEASE TAKE NOTICE** that plaintiff hereby appeals to the United States Court of Appeals for the Second Circuit from the annexed Opinion and Order dated March 31, 2025, granting defendants' motion for summary judgment, and from the annexed Judgment entered on March 31, 2025, by the Clerk of Court dismissing this matter.

      Dated: April 11, 2025

                                  Respectfully submitted,

                                  Michael H. Sussman [3497]

SUSSMAN & ASSOCIATES
Counsel for Plaintiff Barberan
PO BOX 1005
1 Railroad Avenue, Ste. 3
Goshen, NY 10924
(845)-294-3991 [ph]
(845)-294-1623 [fax]
Sussman1@sussman.law

To: Brian Sokoloff, Esq., counsel for defendants via ECF

1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
Anthony Barberan,

                              Plaintiff,

            -against-                                    19 **CIVIL** 10983 (VR)

                                                        **JUDGMENT**
Town of Eastchester, et al.,

                              Defendants.
----------------------------------------------------------------X

　　　　It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in

the Court's Opinion & Order dated March 31, 2025, the motion for summary judgment by

Defendants Town of Eastchester, Timothy Bonci, and Jeffrey Hunter is GRANTED.

Accordingly, the case is closed.

**Dated:** New York, New York

　　　　March 31, 2025


                                            **TAMMI M HELLWIG**
                                    _____
                                            **Clerk of Court**

                        **BY:**
                                    _____
                                            **Deputy Clerk**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_ 3/31/2025
```

-------------------------------------------------------------------X

Anthony Barberan,

                              Plaintiff,

           -against-

Town of Eastchester et al.,

                              Defendants.

-------------------------------------------------------------------X

                              19-cv-10983-VR

                           **OPINION & ORDER**

**VICTORIA REZNIK, United States Magistrate Judge:**[1]

Plaintiff Anthony Barberan sues Defendants Town of Eastchester, Timothy Bonci, and Jeffrey Hunter, seeking to recover for harms he suffered when he was terminated from the Town of Eastchester Police Department in 2021. (ECF No. 1). On September 13, 2022, the parties consented to jurisdiction before a Magistrate Judge for all purposes, under 28 U.S.C. § 636(c). (ECF No. 70). Defendants now move for summary judgment. (ECF No. 111). For the reasons below, the motion is **GRANTED**.

---

[1] On September 13, 2022, the parties consented to proceed before a Magistrate Judge (ECF No. 70) and this action was assigned to Magistrate Judge Andrew E. Krause. On September 6, 2024, this action was reassigned to the undersigned.

1

# I.  FACTUAL BACKGROUND[2]

Plaintiff began working for the Town of Eastchester Police Department ("the Department") on July 16, 2012. (ECF Nos. 113 at ¶ 36; 119 at ¶ 36). He then allegedly completed field training and his probationary period with no issues, causing him to obtain civil service status. (ECF Nos. 112-9 at 29–30; 119 at 57–58 ¶¶ 14–19). Between July 2012 and July 2014, Plaintiff had no major disciplinary issues, the only instances of an infraction came from failing to wear his officer's hat while out on patrol. (ECF Nos. 113 at ¶¶ 37–47; 119 at ¶¶ 37–47).

## A. July 2014 - Disciplinary Action Re Contraband

On July 16, 2014, Plaintiff was investigated for violating multiple provisions of the Department's employee manual when he failed to locate contraband during a search incident to a lawful arrest. (ECF Nos. 112-34; 113 at ¶¶ 55–60; 119 at ¶¶ 55–60). Four days earlier, Plaintiff had placed an arrestee into a cell and failed to remove his belt or locate a razor blade on his person. (ECF Nos. 113 at ¶¶ 55–60; 119 at ¶¶ 55–60). The arrestee's possession of a razor blade does not appear to have resulted in any injuries to himself or others, as it was discovered less than 24 hours after his initial placement in the cell when a different officer searched the arrestee after he was arraigned. (ECF Nos. 112-32 at 2; 113 at ¶ 57; 119 at ¶ 57).

---

[2] The following facts are drawn from each of the parties' Rule 56.1 Statements of Material Facts, along with their supporting affidavits and exhibits. (ECF Nos. 113 [Defendants] and 119 [Plaintiff]).

Plaintiff entered into a settlement agreement with the Department to resolve the investigation, in which he plead guilty to violating three provisions of the manual. (ECF No. 112-34). The agreement provided that any further instances of similar misconduct would result in additional disciplinary charges that could result in termination of his employment. (ECF Nos. 112-34; 113 at ¶¶ 61–62; 119 at ¶¶ 61–62). He was then placed on a remedial training plan for approximately two months. (ECF Nos. 113 at ¶ 63; 119 at ¶ 63).

## B. September 2015 – Hunter's Alleged Comments

In September 2015, Plaintiff met with Defendant Hunter, a Lieutenant with the Department, to discuss video of a traffic stop Plaintiff conducted one month earlier. (ECF Nos. 112-12 at 86–87; 113 at ¶¶ 79–84; 119 at ¶¶ 79–84). At the meeting, Hunter allegedly criticized Plaintiff for using informal slang when he spoke to the teenagers in the vehicle. (ECF No. 119 at 59 ¶¶ 26–27).[3] Hunter also allegedly stated that Plaintiff's "Yonkers ghetto doesn't add up to my Eastchester professional," and proceeded to show Plaintiff a video of a Black hip-hop artist with dreadlocks dressed in baggy clothes and chains, and displaying underwear to demonstrate how Plaintiff presented himself. (*Id.* at 59 ¶¶ 29–30). Hunter allegedly

---

[3] In ECF No. 119, Plaintiff responded to each of the numbered paragraphs included by Defendants in their Rule 56.1 Statement of Undisputed Material Facts, (ECF No. 113), but he also included additional numbered paragraphs at the end of his response. These additional paragraphs, confusingly, restarted the paragraph numbering scheme. To avoid confusion between the paragraphs from Defendants' Rule 56 statement and the additional, renumbered ones in Plaintiff's response, citations to the renumbered paragraphs will include the associated page number from Plaintiff's response.

continued making disparaging comments to Plaintiff that "this is what Yonkers does" and "this is how Yonkers trains its men." (*Id.* at 59 ¶ 33). At his deposition, Hunter denied making any of the above statements or showing Plaintiff a video of a Black artist. (ECF No. 112-12 at 86–88).

### C. 2015 – Plaintiff's Remedial Training Plan

Plaintiff was then placed on a second remedial training plan for two months, after his supervisors determined that he needed to improve his professionalism and skills related to vehicle traffic stops, vehicle searches, and pat-down searches. (ECF Nos. 112-38; 113 at ¶¶ 79–98; 119 at ¶¶ 79–98). Plaintiff received two performance reviews for the 2015 calendar year. (ECF Nos. 112-31, 41). In one review, 21 of the 22 categories were marked as "Meets Standard," with just one category regarding the accuracy and completeness of forms marked as "Requires Improvement." (ECF No. 112-41). The review also included a notation that Plaintiff was "eager to improve and be more active." (*Id.* at 17). In the other review, 14 of the 22 categories were marked as meeting the requisite standards. (ECF No. 112-31). The remaining categories, which included, among other things, "Acceptance of Direction," "Acceptance of Responsibility," and "Productivity," were marked as needing improvement. (*Id.*). The second review contained notations that Plaintiff lacked maturity, needed to improve his attitude, and act less negative. (*Id.* at 15–16).

Based on those performance reviews, Plaintiff was placed on a performance improvement plan by Defendant Bonci, Chief of the Department. (ECF Nos. 112-42; 113 at ¶ 109; 119 at ¶ 109). Under the improvement plan, Plaintiff was scheduled to

4

work shifts during the day that differed from his then-current schedule. (ECF No. 112-42). Over the duration of his improvement plan, Plaintiff was found to have failed to meet expectations. (ECF Nos. 113 at ¶¶ 113–15; 119 at ¶¶ 113–15).

### D. October 2016 – Accidental Taser Discharge

Shortly thereafter, Plaintiff was placed on a remedial training plan for a third time in October 2016, after he accidentally discharged a taser in the Department's locker room. (ECF Nos. 112-46; 113 at ¶¶ 116–20; 119 at ¶¶ 116–20). Plaintiff obtained a taser from a secured locker to perform a daily test and ensure the taser functioned properly. (ECF No. 112-10 at 97–99; 112-46 at 3–4). While alone in the room, he pulled the trigger and the weapon discharged while it was pointed at the ground, because he failed to realize that it was already armed with live cartridges. (ECF Nos. 112-10 at 97–101; 112-46 at 3–4; 113 at ¶ 117; 119 at ¶ 117). A supervisor interviewed him about the incident after it happened, and Plaintiff confirmed that he failed to notice the taser was armed before he discharged it. (ECF Nos. 112-10 at 101–02; ECF No. 112-46 at 3–4). Roughly one month after the incident, he received remedial training on taser procedures. (ECF Nos. 112-46 at 3–4; 113 at ¶ 120; 119 at ¶ 120).

### E. February 2018 – Plaintiff's Denied Assignment Requests

As alleged in Plaintiff's Second Amended Complaint, in February 2018, Plaintiff allegedly applied for an assignment on the Department's drug task force, after a coworker suggested he apply. (ECF No. 75 at ¶¶ 126–28; 119 at 84 ¶¶ 251–

5

52).[4] But on March 27, 2018, he was purportedly notified that he was not selected

for that assignment but received no rationale for the determination, while other

Caucasian coworkers were selected instead. (ECF Nos. 75 at ¶¶ 139–43; 119 at 84

¶¶ 254). At roughly the same time, Plaintiff allegedly requested an assignment to

the traffic car unit. (ECF No. 75 at ¶ 145). That request was also allegedly denied,

with the assignments being given to other, Caucasian coworkers. (*Id.* at ¶¶ 148–49).

### F. Plaintiff's August 2018 Letter and December 2018 EEOC Charge

On August 28, 2018, Plaintiff purportedly retained counsel and sent a letter

to Bonci complaining about the discrimination he suffered at the Department. (ECF

No. 117-21). Plaintiff then filed a charge against the Department with the Equal

Employment Opportunity Commission ("EEOC") in December 2018, in which he

checked the boxes for race discrimination, retaliation, and continuing action. (ECF

Nos. 112-7; 113 at ¶ 7; 119 at ¶ 7). He alleged that Lieutenant Hunter criticized him

"for not acting as he believes a Caucasian officer should" (ECF No. 112-7 at 4) and

that he was "discriminated against based upon his failure to conform to racial

stereotypes, and retaliated against for his complaints of discrimination." (*Id.* at 3).

His charge referred to Hunter's alleged comments about the "Yonkers ghetto" and

Plaintiff behaving like a Black hip-hop artist, Plaintiff's remedial training plan and

his related complaints to supervisors, and his failure to be selected for the drug task

---

[4] In his opposition papers, Plaintiff contends that not being assigned to the drug task force or the
traffic car unit were adverse employment actions he suffered. (ECF No. 118 at 15). But he only
addresses the drug task force assignment in his response to Defendants' Rule 56.1 statement; he
does not mention the traffic car unit. (ECF No. 119)

force and traffic car unit. (*Id.* at 3–12). He failed to identify his race or Hispanic national origin but did state that he was "raised in an underprivileged, racially diverse neighborhood in Yonkers." (*Id.*). The EEOC then provided him with a letter stating that it was "unable to conclude that the information obtained establishe[d] violations of the statute," but he was informed that he had a right to sue Defendants. (ECF 112-23).

### G. October 2019 – Second Disciplinary Action re Contraband

Plaintiff failed again to locate contraband in an arrestee's possession in July 2019. (ECF Nos. 112-14; 113 at ¶¶ 121–28; 119 at ¶¶ 121–28). He failed to discover a bandana before placing the arrestee into a holding cell, which the arrestee later used in an attempted suicide by hanging. (ECF Nos. 112-14; 113 at ¶¶ 122, 125; 119 at ¶¶ 122, 125). An investigation occurred, during which Plaintiff admitted that he failed to search the arrestee. (ECF Nos. 112-14 at 4–5; 113 at ¶ 125; 119 at ¶ 125). After the investigation was complete, the Department proposed that Plaintiff lose three vacation days as a penalty for violating Department rules, and Plaintiff accepted the proposal in October 2019. (ECF Nos. 75 at ¶¶ 192–197; 112-14 at 6).

### H. March 2021 – Plaintiff's Second EEOC Charge

Plaintiff filed a second charge with the EEOC on March 26, 2021, which mirrored his initial charge—he checked the boxes for race discrimination and retaliation and identified the discrimination as a continuing action. (ECF Nos. 112-8; 113 at ¶ 16; 119 at ¶ 16). The second charge included two attachments, a copy of Plaintiff's first amended complaint and a news article. (ECF No. 112-8 at 34–92).

7

But he did not check the box for national origin discrimination and he again failed
to explicitly state that he was Hispanic. Plaintiff's first amended complaint
(described more fully below), made no mention of being Hispanic and alleged that
he was Caucasian and discriminated against because of "his failure to conform to
racial stereotypes." (ECF No. 24 at ¶¶ 1, 5). The only mention of his Hispanic
national origin came in the annexed news article, which identified him as "a
Hispanic Eastchester police officer who has a pending discrimination litigation"
against Defendants. (ECF No. 112-8 at 91). But the EEOC never issued a ruling
related to this second charge. (ECF Nos. 113 at ¶ 16; 119 at ¶ 16).

### I.  November 2021 – Third Disciplinary Action and Termination

Over one year after Plaintiff filed his original complaint in this Court and
this litigation was pending, Plaintiff was investigated for a third instance of failing
to properly search an arrestee. Plaintiff and an Officer Guerriero, one of his
coworkers who began working for the Department in January 2020 (ECF No. 112-
17 at 8), responded to a vehicular accident. (ECF Nos. 113 at ¶¶ 132–35; 119 at
¶¶ 132–35). While at the accident scene, Plaintiff handcuffed the driver and placed
him in the police car before searching him. (ECF Nos. 113 at ¶¶ 132–40; 119 at
¶¶ 132–40). Plaintiff then searched a satchel in the driver's possession and found
drugs. (ECF Nos. 113 at ¶¶ 141–43; 119 at ¶¶ 141–43). When Plaintiff and
Guerriero placed the driver into a holding cell, they failed to search the driver, and
it was eventually revealed that the driver possessed additional drugs on his person.
(ECF Nos. 113 at ¶¶ 146–50; 119 at ¶¶ 146–50).

Following that incident, a formal investigation was launched by the Department, and it was determined that Plaintiff's actions during that arrest violated several Department rules. (ECF Nos. 113 at ¶¶ 150–58; 119 at ¶¶ 150–58). Plaintiff received one charge of insubordination and one charge of incompetence, which resulted in a formal disciplinary hearing lasting about four days. (ECF Nos. 113 at ¶¶ 159, 164; 119 at ¶¶ 159, 164). Over the course of the hearing, the Hearing Officer heard testimony from several witnesses, including Plaintiff, and viewed video evidence of the arrest. (ECF Nos. 113 at ¶ 165; 119 at ¶ 165). The Hearing Officer found that Plaintiff violated departmental rules and recommended terminating his employment. (ECF Nos. 113 at ¶¶ 168–72; 119 at ¶¶ 168–72). Defendant Town of Eastchester ("the Town") adopted the Hearing Officer's recommendation and terminated Plaintiff's employment in November 2021. (ECF Nos. 113 at ¶ 173; 119 at ¶ 173).

## J.  Procedural History

### a.  November 2019 – Plaintiff's Original Complaint

Shortly after Plaintiff's disciplinary action in October 2019, Plaintiff commenced this action (on November 27, 2019) against Defendants in the Southern District of New York. (ECF No. 1). In his complaint, he asserted causes of action for discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 1981 and 1983, and the New York State Human Rights Law ("N.Y.S.H.R.L."). (*Id.* at 19–25). He alleged, among other things, that he was

9

Caucasian, discriminated against because of "his failure to conform to racial stereotypes," and retaliated against "for complaining of discrimination." (*Id.* at 1).

### b. March 2020 – Plaintiff's First Amended Complaint

Plaintiff amended his complaint in March 2020, but realleged that he was Caucasian, discriminated against by Defendants for "his failure to conform to racial stereotypes," and retaliated against by Defendants for complaining about his discrimination. (ECF No. 24 at ¶¶ 1, 5). Defendants then moved under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the amended complaint for its failure to state a claim. (ECF No. 28). Defendants argued, among other things, that Plaintiff's Title VII and N.Y.S.H.R.L. claims should be dismissed because they were time-barred, as many of the factual allegations underlying the claims involved a timeframe outside the 300-day window required to file EEOC charges. (ECF No. 30 at 14–15). They also argued that Plaintiff's Section 1983 claim should be dismissed as time-barred because it relied on incidents that occurred outside the three-year statute of limitations. (*Id.* at 15). Lastly, in their reply papers, they contended that Plaintiff failed to exhaust his Title VII discrimination claim because his EEOC charge failed to mention his October 2019 penalty for lost vacation days. (ECF No. 35 at 8–9).

By order entered March 22, 2021, Defendants' motion was partially granted and Plaintiff's Section 1981 claims were dismissed. (ECF No. 38). But Plaintiff's Title VII, Section 1983, and N.Y.S.H.R.L. claims survived dismissal. (*Id.*). At a

10

hearing on April 7, 2021, Judge Briccetti issued a ruling from the bench setting forth his rationale supporting the March 22nd order. (ECF No. 52). Among other things, he was "not persuaded" by Defendants' argument that claims were time-barred and declined to address their argument about exhaustion because they were raised for the first time in Defendants' reply papers. (ECF No. 52 at 4–5).

### c.  October 2022 – Plaintiff's Second Amended Complaint

In October 2022, Plaintiff amended his complaint for a second time. (ECF No. 75).[5] In his second amended complaint, he alleged that he was "of Hispanic descent" and removed his prior allegation that he was Caucasian (id. at ¶ 3), but he reasserted causes of action under Title VII, Section 1983, and the N.Y.S.H.R.L. for discrimination and retaliation. (ECF No. 75 at 30–50). As for discrimination, he alleged that he suffered three adverse employment actions because of discrimination: (1) he was denied assignments to the drug task force and traffic car unit in March 2018, (2) he was penalized with lost vacation days in October 2019, and (3) he was terminated in November 2021. (ECF Nos. 75 at 30–50). He did not explicitly allege that he was discriminated against based on his national origin—being Hispanic of Ecuadorian descent—but his allegations centered on the fact that he was raised in Yonkers, New York, and that he failed to conform to the racial

---

[5] The parties stipulated to the filing of a second amended complaint (ECF Nos. 112-6; 113 at ¶ 19; 119 at ¶ 19). As part of the stipulation, Defendants agreed that Plaintiff could amend his complaint for a second time and Plaintiff agreed that he would not file a third charge with the EEOC or amend his complaint to add a Title VII claim related to the termination of his employment. (ECF No. 112-6). The stipulation was then so-ordered by the Court in January 2022. (Id.).

11

stereotypes of a Caucasian officer. (*Id.* at ¶¶ 244–46, 266–67, 296–97, 329–30). With respect to retaliation, he alleged that he engaged in protected activity by complaining to the Department in August 2018 and primarily suffered two adverse employment actions thereafter when he was disciplined in October 2019 and terminated in November 2021.[6] (*Id.* at 32–33).

Defendants now move for summary judgment dismissing the second amended complaint, (ECF No. 111), which Plaintiff opposes. (ECF No. 118).

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is material under Rule 56 where it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[7] A dispute about a material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*[8] In determining whether the moving party has met its burden of proving that there are no genuine disputes of material fact, the Court must resolve all ambiguities and draw all factual inferences for the party opposing the motion. *See Union Mut. Fire Ins. Co. v. Ace Caribbean Mkt.*, 64 F.4th 441, 445

---

[6] Plaintiff also alleged that he suffered adverse employment actions when he, among other things, was not allowed to participate in a community outreach program in October 2018, manage the Department's social media account in September 2018, or display a Christmas tree in the office in December 2018. (ECF No. 75 at 41–42).

[7] *See also Red Tree Invs., LLC v. Petróleos de Venez., S.A.*, 82 F.4th 161, 170 (2d Cir. 2023).

[8] *See also Red Tree Invs.*, 82 F.4th at 170.

12

(2d Cir. 2023). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (internal quotation marks and citations omitted).[9]

"When the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to its case." *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (alteration, internal quotation marks, and citation omitted). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996).

Yet summary judgment must be denied if the Court finds "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. Summary judgment is also appropriate when the movant submits undisputed evidence "that negates an essential element of the non-moving party's claim." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (internal quotation marks and citations omitted).

---

[9] *See also Wiggins v. Griffin*, 86 F.4th 987, 995 (2d Cir. 2023) (per curiam).

13

## III.   DISCUSSION

### A. Statute of Limitations

Defendants first argue that the statute of limitations bars many of Plaintiff's

allegations, which include alleged discriminatory treatment between 2014 and

2017. (ECF No. 114 at 12). According to Defendants, Plaintiff's Title VII claims

cannot be based on any alleged adverse employment actions that occurred before

February 2018, because such conduct is outside the 300-day window created by the

filing of his first EEOC complaint in December 2018. (*Id.* at 12–13). They also argue

that no factual allegations of conduct before November 27, 2016, can support his

Section 1983 and NYSRHL claims, because those allegations are outside the

permissible three-year statute of limitations for those causes of actions. (*Id.*).

In response, Plaintiff argues that none of his claims are time-barred because

he was subjected to similar, ongoing discrimination, which allows conduct outside

the statute of limitations to be considered by the Court. (ECF No. 118 at 12). In

reply, Defendants maintain that Plaintiff's claims are untimely because he failed to

"invoke a continuing violation theory in his first EEOC charge." (ECF No. 124 at 6–

7). They maintain further that Plaintiff failed to allege a continuing violation

because he failed to identify a continuing discriminatory policy or custom, so his

allegations amount to discrete acts of discrimination. (*Id.*).

Here, although not raised by either side, Defendants' contentions are subject

to the law-of-the-case doctrine, as they were raised previously by Defendants in

support of their motion to dismiss the first amended complaint, (ECF No. 30 at 5–

14

8), and addressed by Judge Briccetti in his bench ruling in April 2021. (ECF No. 52 at 5). In articulating his rationale for denying the portions of Defendants' motion to dismiss, Judge Briccetti stated he was "not persuaded" by their statute of limitations arguments and noted that Defendants provided no authority to support their propositions. (*Id.*). He emphasized that Plaintiff's alleged adverse employment actions occurred within the statute of limitations, which was sufficient for Plaintiff to sustain his discrimination claims. (*Id.*).

"When a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case." *JLM Couture, Inc. v. Gutman*, 91 F.4th 91, 101 (2d Cir. 2024) (internal quotation marks and citation omitted). The law-of-the-case doctrine is not binding and "does not preclude this Court from reconsidering issues on summary judgment that have initially been raised in the context of a motion to dismiss." *Nobel Ins. Co. v City of New York*, No. 00-CV-1328 (KMK), 2006 WL 2848121, at *4 (S.D.N.Y. Sept. 29, 2006). But it counsels against doing so "absent cogent and compelling reasons such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Loomis Sayles Tr. Co., LLC v. Citigroup Glob. Mkts., Inc.*, No. 22 Civ. 6706 (LGS), 2024 WL 4307775, at *2 (S.D.N.Y. Sept. 26, 2024) (internal quotations marks and citations omitted).

Defendants fail to identify any change in the law, clear error by Judge Briccetti, or manifest injustice that would warrant revisiting these issues from the motion to dismiss. Indeed, they cite no case law for the proposition that evidence of

15

discriminatory animus must all take place within the statute of limitations period to be considered. And they fail to explain how new evidence obtained during discovery would address the *question of law* regarding whether any of Plaintiff's factual allegations were time-barred. Thus, there is no reason for this Court to reevaluate these contentions on summary judgment. *See Fezzani v. Bear, Stearns & Co. Inc.*, No. 99 Civ. 0793 (PAC), 2023 WL 2612454, at *3 (S.D.N.Y. Mar. 23, 2023) (affirming application of law-of-the-case doctrine by Magistrate Judge because question previously decided was question of law).

### B. Exhaustion/Jurisdiction

Defendants also argue that Plaintiff's Title VII discrimination claims must be dismissed because his previous EEOC charges failed to allege national origin discrimination and mention his Hispanic heritage, both of which he asserted in his second amended complaint and in opposition to Defendants' summary judgment motion. (ECF No. 114 at 13). Plaintiff argues in opposition that his Title VII claims may proceed because his allegations allow for the conclusion that a national origin discrimination claim could be reasonably expected to grow out of the discrimination charges contained in his EEOC charges. (ECF No. 118 at 12–13).

"A district court only has jurisdiction to hear claims which are either raised in the EEOC charge, or are 'reasonably related' to the EEOC charges." *Burrell v. City Univ. of N.Y.*, 995 F. Supp. 398, 407–08 (2d Cir. 1998) (quoting *Butts v. City of N.Y. Dept. of Hous.*, 990 F.2d 1397, 1402 (2d Cir. 1993)). A claim is reasonably related to an EEOC charge when an EEOC investigation of that charge could lead

the EEOC to discover that the plaintiff was alleging the type of discrimination identified in the complaint. *See Faktorovich v. Mem'l Sloan-Kettering Cancer Ctr.*, 578 F. App'x 41, 42 (2d Cir. 2014). Thus, the agency receives adequate notice to investigate discrimination on that other bases. *See id.*; *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003). In making that determination, the focus is on the "substance of the charge," i.e., the factual allegations contained within the four corners of the EEOC charge itself. *Alonzo v. Chase Manhattan Bank, N.A.*, 25 F. Supp. 2d 455, 458 (S.D.N.Y. 1998); *see Deravin*, 335 F.3d at 201 (explaining that "the focus should be on the factual allegations made in the EEOC charge itself, describing the discriminatory conduct about which a plaintiff is grieving" (internal quotation marks, brackets, and citations omitted)). Thus, "[c]ourts generally do not find a claim that is based on a wholly different type of discrimination to be reasonably related to those initially asserted in the EEOC charge." *Burrell*, 995 F. Supp. at 407.

Plaintiff fails to demonstrate that the EEOC had adequate notice of his claims of national origin discrimination. A rational finder of fact could not conclude that an EEOC investigation of his EEOC charges would lead the EEOC to conclude that he was also alleging national origin discrimination based on being Hispanic. Neither of his EEOC charges include the words "national origin." (ECF Nos. 112-7, 8). Even so, that fact is not necessarily dispositive or fatal to his discrimination claims. Rather, it simply places more emphasis on his claim's factual underpinnings. *See Akhtar v. Saudia*, No. 19 CV 03763-LTS-DCF, 2021 WL

17

1758807, at *4–6 (S.D.N.Y. May 4, 2021) (concluding plaintiff's claims of national

origin discrimination were administratively exhausted despite EEOC charge not

explicitly mentioning "the actual words 'national origin' within the factual

narrative").

But neither of Plaintiff's EEOC charges include statements that he is

Hispanic or of Hispanic descent. (ECF Nos. 112-7, 8). And in his second EEOC

charge, he annexed his initial complaint from this action, which explicitly states

that he is Caucasian, does not mention national origin, and includes no mention

that he is Hispanic or of Hispanic descent. (ECF No. 112-8 at 38–90; *see id.* at 37).

The only reference at all to Plaintiff being Hispanic comes in a newspaper article

annexed to his second EEOC charge, where he is described as a "Hispanic

Eastchester police officer," (ECF No. 112-8 at 91), but the EEOC never ruled on that

charge. (ECF Nos. 113 at ¶ 16; 119 at ¶ 16).

The factual allegations in his EEOC charges, instead, center around Plaintiff

being raised in Yonkers and not conforming to the way Defendants expected him to

act, which was Caucasian. He began his first EEOC charge by stating explicitly that

he was "raised in an underprivileged, racially diverse neighborhood in Yonkers" and

that Hunter criticized him "for not acting as he believes a Caucasian officer should."

(ECF No. 112-7 at 3–4). He proceeded to mention Hunter's alleged statement that

"being raised in Yonkers 'wasn't the best approach.'" (*Id.* at 4). The remainder of his

first EEOC charge detailed his conversations with Hunter that Plaintiff was

"Yonkers ghetto," used too much slang, and didn't carry himself properly, and

18

mentions the incident of Hunter showing Plaintiff a video of a Black hip-hop artist to demonstrate how Plaintiff appeared and conducted himself. (*Id.* at 4–16). And the factual contents of his second EEOC charge largely mirrored the first one, as a copy of the first charge was annexed to his second submission. (ECF No. 112-8 at 16–30).[10]

But the factual allegations in these charges never connect the dots for the EEOC to conclude that references to Yonkers were references to his Hispanic national origin, which he never mentions. This is buttressed by the fact that the EEOC's letter to Plaintiff closing out its file failed to mention national origin discrimination. (ECF No. 112-23). The same is true of his second EEOC charge. There, he highlights census statistics, but the statistics all relate to the Black population of Yonkers. (ECF No. 112-8 at 86). Nothing in the underlying facts allows the EEOC to determine there were claims of national origin discrimination. *Cf. Akhtar*, 2021 WL 1758807, at 4–6 (finding plaintiff of Pakistani-descent exhausted national origin discrimination claims because she indicated "on at least one page of the EEOC form that she was alleging employment discrimination on the basis of her national origin" and "the factual underpinnings" of the allegations in the EEOC charge supported that).

---

[10] A copy of his first amended complaint, which alleged similar facts to his first EEOC charge, was also annexed to his second EEOC charge. (ECF No. 112-8 at 34–90).

This Court recognizes that it should be cautious when analyzing whether discrimination involves national origin or race because the line between them is "difficult to trace," *id.* at *4 (internal quotation marks and citations omitted), and there is "uncertainty among courts as to whether 'Hispanic' is better characterized as a race or a national origin." *Alonzo*, 25 F. Supp. 2d at 460. It also recognizes that "courts should not attempt to draw overly fine distinctions between race and national origin claims as part of the threshold exhaustion inquiry . . . given the potential overlap between the two forms of discrimination." *Deravin*, 335 F.3d at 202.

But this is not a case that turns on whether Plaintiff checked the wrong box when characterizing himself as Hispanic. He never characterized himself as Hispanic at all. *Alonzo v. Chase Manhattan Bank, N.A.*, 25 F. Supp. 2d 455 (S.D.N.Y. 1998) presents a similar scenario with a defining difference. There, the plaintiff only checked the box for national origin discrimination in his EEOC charge, and failed to check the box for race discrimination. *Id.* at 458. But the charge contained an explicit statement that the plaintiff was Hispanic and believed he was discriminated against because he was Hispanic. *Id.* at 459. That direct mention of Hispanic, combined with the uncertainty regarding whether Hispanic amounts to race or national origin and the corresponding difficulty associated with demarcating between race and national origin discrimination, caused the Court to conclude that the plaintiff's race discrimination claims were reasonably related to his national origin claims. *Id.* at 459–60. Here, the substance of Plaintiff's EEOC

20

charges lacks any mention of being Hispanic or being discriminated against based on being Hispanic. *Compare Dixit v. City of N.Y. Dep't of Gen. Servs.*, 972 F. Supp. 730, 734–35 (S.D.N.Y. 1997) (finding race and national origin discrimination claims reasonably related where plaintiff identified himself as an "Asian Indian," a term suggestive of both race and national origin, in his EEOC complaint).

Thus, there is no way to conclude that the facts of the EEOC charges sufficiently informed the EEOC that discrimination based on national origin was "lurk[ing] in the background." *Alonzo*, 25 F. Supp. 2d at 458. As a result, Plaintiff has failed to exhaust his administrative remedies and his Title VII discrimination claim must be dismissed. *See Faktorovich*, 578 F. App'x at 42 (affirming dismissal of Title VII national origin discrimination claims because they were not reasonably related to the claims of religious and disability discrimination in EEOC charge, as EEOC charge of Jewish plaintiff failed to reference Belorussian national origin); *cf. Alonzo*, 25 F. Supp. 2d at 460 (finding discrimination claim based on race exhausted because plaintiff alleged discrimination claim based on national origin and explicitly stated he was Hispanic).

## C. Plaintiff's Discrimination Claims[11]

Defendants argue that all of Plaintiff's discrimination claims should be dismissed because he cannot satisfy his initial burden under the *McDonnell*

---

[11] Although the Court found that Plaintiff's Title VII discrimination claims were not exhausted and should be dismissed on that basis, this Section still analyzes whether Plaintiff satisfied his prima facie burden on that claim, assuming it had been exhausted.

*Douglas* test: (1) he is not a member of a protected class (ECF No. 114 at 15), (2) was not qualified to be a police officer, (*id.* at 17–19), and (3) has no evidence of discrimination. (*Id.* at 19–23). And even if Plaintiff could satisfy that initial burden, Defendants argue that they had legitimate nondiscriminatory reasons for not assigning him to the drug task force and traffic car unit, disciplining him, and terminating his employment. (*Id.* at 22–23).

Plaintiff argues in opposition that he has satisfied his initial burden. He is a member of a protected class because his father is from Ecuador and he is Hispanic (ECF No. 118 at 14). He was qualified for the position because he "met the minimum qualifications to serve as a police officer" after graduating from the academy and passing his probationary period. (*Id.* at 15). He suffered adverse actions when he was not selected for the drug task force and traffic car unit, forced to forfeit vacation days, and terminated. (*Id.*). And the circumstances gave rise to discrimination based on his national origin. (*Id.*).

Claims of discrimination under Title VII, 42 U.S.C. § 1983, and the N.Y.S.H.R.L. are all subjected to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 412 U.S. 792 (1973). *See Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015). Under that framework, the plaintiff "must first show that (1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Kirkland-Hudson v. Mount Vernon City Sch. Dist.*, 665 F. Supp. 3d 412, 449 (S.D.N.Y. 2023) (quoting

22

*Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)). If the plaintiff makes his or her showing successfully, the burden shifts to the defendant "to demonstrate a legitimate, [nondiscriminatory] purpose for the adverse employment action." *Kirkland-Hudson*, 665 F. Supp. 3d at 449. Upon a successful showing by the defendant, the burden returns to the plaintiff to demonstrate by a preponderance of the evidence that the nondiscriminatory reason supplied by the defendant was a pretext for discrimination. *Id.*

"Summary judgment is appropriate even in discrimination cases," *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000), *cert. denied*, 540 U.S. 811 (2003), but "additional considerations" must be considered. *Desir v. City of New York*, 453 F. App'x 30, 33 (2d Cir. 2011). A trial court must scrutinize the evidence presented "for circumstantial proof which, if believed, would show discrimination." *Id.* (internal quotation marks and citation omitted). When analyzing each element of the *McDonnell Douglas* burden-shifting framework, there "must be a determination of whether the proffered admissible evidence . . . would be sufficient to permit a rational finder of fact" to conclude that the element was satisfied. *LaFond v. Gen. Physic Servs. Corp.*, 50 F.3d 165, 173 (2d Cir. 1995) (internal quotation marks and citations omitted). "[I]t is not within the province of the trial court at the summary judgment stage to resolve ambiguities" and "decide what inferences should be drawn." *Id.* at 173–74 (internal quotation marks and citations omitted).

The Court addresses each of the four elements in turn.

### 1. Whether Plaintiff is a Member of a Protected Class

23

Plaintiff alleges that he is a member of a protected class, because he is of Ecuadorian descent and Hispanic. (ECF Nos. 75 at ¶ 23; 112-9 at 50). Defendants express skepticism, given that Plaintiff's EEOC charges never mention that he is Hispanic, his original and first amended complaints only mention that he is Caucasian, and other documents in the record appear to report Plaintiff as Caucasian/White and non-Hispanic. (ECF No. 114 at 15). But Defendants' skepticism does not warrant a finding that there is no genuine issue of material fact about Plaintiff's Hispanic national origin.

Plaintiff testified about his Hispanic background and the fact that his father was born in Ecuador. (ECF No. 112-9 at 51). His second amended complaint, which is the operative complaint here, alleges that he is Hispanic. (ECF No. 75 at ¶ 23). Documents in the record include one instance in which Plaintiff is identified as Hispanic, although most do not. (ECF Nos. 1 at ¶ 15; 24 at ¶ 27; 112-25 at 2; 112-26 at 2–5). And courts are uncertain about whether Hispanic is better viewed as a race or as a national origin, *see Alonzo*, 25 F. Supp. 2d at 459–60, which supports Plaintiff's argument that one can identify as Caucasian (by race) and also Hispanic (by national origin). (ECF No. 118 at 13–14).[12]

---

[12] The Court also takes judicial notice of the fact that the 2020 Census Informational Questionnaire lists separate questions for national origin and race, thereby allowing a person to check the box for Hispanic national origin while also checking the box for White race. *See Decennial Census of Population and Housing Questionnaires & Instructions*, United States Census Bureau, https://www.census.gov/programs-surveys/decennial-census/technical-documentation/questionnaires.2020_Census.html; *United States v. Style*, 771 F. App'x 43, 43 (2d Cir. 2019) (taking judicial notice of fact from United States Census Bureau). This adds additional support to Plaintiff's contention that he is a White Hispanic.

24

Thus, for purposes of summary judgment, Plaintiff has proffered sufficient evidence to allow a rational finder of fact to conclude that he is a member of a protected class because he is Hispanic of Ecuadorian descent, thereby satisfying his prima facie burden on this element. *See Gurjar v. Norwood Bd. of Educ.*, No. 2:16-cv-1168 (SDW)(SCM), 2018 WL 1634398, at *5 n.10 (D.N.J. Apr. 5, 2018) (denying summary judgment after concluding question of fact existed regarding whether plaintiff was member of protected class); *see also Velez v. Project Renewal*, No. 02 Civ. 3084(AKH), 2003 WL 402500, at *3 (S.D.N.Y. Feb. 20, 2003) (holding that plaintiff was member of protected class because he was "a Hispanic of Puerto Rican descent"). Defendants may view this as "dubious" and argue facts to the contrary, but that at most raises a question of fact for the jury to decide.

### 2. **Whether Plaintiff is Qualified for the Position**

Next, Defendants argue that Plaintiff cannot meet his prima facie burden to show that he was qualified for the position of police officer because "he proved to be a danger and a liability to the community, and his termination came after he received countless chances to correct his conduct." (ECF No. 114 at 17). Defendants largely reiterate the evidence of Plaintiff's performance record, remedial training, and disciplinary actions, which they believe justified Plaintiff's termination. (*Id.* at 9–11). In response, Plaintiff argues that he was qualified to be a police officer, because he "plainly met the minimum qualifications to serve as a police officer." (ECF No. 118 at 15). For example, Plaintiff passed a written exam for a different, nearby police department, graduated from the police academy, completed his

probationary period with the Department, and earned civil service status. (ECF No. 112-9 at 28, 40).

To demonstrate that he was qualified for his position with the Department, Plaintiff only needs to show that he possessed "the basic skills necessary for performance of the job." *Owens v. N.Y.C. Hous. Auth.*, 934 F.2d 405, 409 (2d Cir. 1991) (internal quotation marks, brackets, and citation omitted), *cert. denied*, 502 U.S. 964 (1991). This showing has been described as "minimal." *Id.* He need not show that his job performance was "flawless or superior." *de la Cruz v. N.Y.C. Hum. Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 20 (2d Cir. 1996). "[A]ll that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001), *cert. denied*, 534 U.S. 951 (2001). In cases involving termination, where the employer has already hired the employee, "the inference of minimal qualification is not difficult to draw," *id.*, because the employer has already demonstrated that the employee is minimally qualified. *Gregory v. Daly*, 243 F.3d 687, 696–97 (2d Cir. 2001). And that inference is only strengthened when the employer retained the plaintiff for a long time. *Id.*

Defendants' arguments that Plaintiff's poor performance shows he was not qualified are not entirely off-base. "There are circumstances in which a plaintiff's performance is so manifestly poor as to render her unqualified for continued employment and thereby defeat her prima facie case." *Forbes v. Tri-County Care, LLC*, No. 21 Civ. 01366 (JHR), 2025 WL 743945, at *7 (S.D.N.Y. Mar. 7, 2025)

26

(internal quotation marks and citations omitted). And an "extensive disciplinary history" may be sufficient to conclude that a plaintiff was not qualified. *See Santiago v. City of New York*, No. 20-cv-6098 (ALC) (SLC), 2024 WL 4354878, at *10 (S.D.N.Y. Sept. 28, 2024) (finding plaintiff not qualified to be police officer because disciplinary history contained, among other things, incidents of associating with known felons, disobeying direct orders from commanders, failing to testify truthfully under oath, and conviction for criminal trespass).

But the contents of Plaintiff's disciplinary history here pale in comparison to cases where a history of discipline allowed for an inference that a person was so unqualified as to not possess the basic skills necessary for the job. Plaintiff's three instances of failing to search an arrestee and his charges for insubordination and incompetence, (ECF Nos. 113 at ¶¶ 55–60, 121–28, 132–35, 159, 164; 119 at ¶¶ 55–60, 121–28, 132–35, 159, 164), do not amount to the type of extensive disciplinary history that renders someone unqualified as a matter of law. *Cf. Santiago*, 2024 WL 4354878, at *10.

In any event, Plaintiff has provided sufficient evidence for a reasonable jury to conclude that he was "minimally qualified" for the job, at least for purposes of meeting his prima facie burden. During his time with the Department, he received at least one positive performance evaluation that said he met the Department's standards for 21 of the 22 categories listed. (ECF No. 112-41). A second performance evaluation indicated he met the standards for 14 of those 22 categories, (ECF No. 112-31), even if he ultimately was placed on a performance improvement plan. (ECF

27

No. 112-42). Further, although his nine-year tenure with the Department, standing alone, cannot establish he was qualified, *see Santiago,* 2024 WL 4354878, at *10 (rejecting argument that plaintiff was qualified solely because he was employed by NYPD for 19 years until he resigned), it strengthens the inference that he possessed the basic skills necessary for the job. *See Gregory*, 243 F.3d at 696 (finding that inference of minimal qualification is easier to draw when employer has already hired employee into the job and retained them for a significant period of time). Indeed, whether Plaintiff was qualified for the position gets at the heart of the disputed issues here—whether Plaintiff's alleged performance issues were a pretext for Defendants' alleged discrimination. In such cases, the Second Circuit has emphasized "that the qualification prong must not be interpreted in such a way as to shift into the plaintiff's *prima facie* case an obligation to anticipate and disprove the employer's proffer of a legitimate, [nondiscriminatory] basis for its decision." *Id.* (citing *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir. 1978)). Thus, Plaintiff has provided sufficient evidence to allow a finder of fact to conclude that he is qualified to be a police officer, thereby satisfying his minimal prima facie burden on this element. *See Forbes*, 2025 WL 743945, at *7 (concluding plaintiff demonstrated that jury could find plaintiff was minimally qualified despite less-than-stellar performance). At the very least, Plaintiff's qualification for the job raises a question of fact for the jury to decide.

### 3. Whether Plaintiff Suffered an Adverse Employment Action

Defendants do not contend that Plaintiff's alleged adverse employment actions cannot meet his prima facie burden, but they also do not concede that this element is satisfied. In any event, because Plaintiff bears the burden of demonstrating satisfaction of this element, the Court addresses it below.

"A plaintiff sustains an adverse employment action if she endures a materially adverse change in the terms and conditions of employment." *Das v. Consol. Sch. Dist. of New Britain*, 369 F. App'x 186, 189 (2d Cir. 2010) (internal quotation marks and citations omitted). For a change to be materially adverse, "it must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Pease v. City of New York*, No. 19 Civ. 7693 (KPF), 2021 WL 2651400, at *9 (S.D.N.Y. June 28, 2021) (internal quotation marks and citation omitted). It must be a change "such as termination, demotion evidenced by a decrease in salary or wage, being given a less distinguished title, a material loss in benefits, significantly diminished material responsibilities, or some other action deleterious to the plaintiff's current or future employment." *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 43 (2d Cir. 2019).

Here, Plaintiff's loss of vacation days in October 2019 and his ultimate termination in November 2021 are materially adverse changes that amount to an adverse employment action. *See Allah v. City of N.Y. Dep't of Parks and Rec.*, 47 F. App'x 45, 49 n.2 (2d Cir. 2002) (concluding plaintiff's termination and loss of vacation days "clearly were adverse employment actions"), *cert. denied*, 537 U.S. 1232 (2003). The Department's alleged failure to assign him to the drug task force

29

and traffic car unit is a closer call. A failure to be promoted constitutes an adverse

action. *See Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002); *Alvarado v.

Metro. Transp. Auth.*, No. 07 Civ. 3561(DAB), 2012 WL 1132143, at *10 (S.D.N.Y.

Mar. 30, 2012). But Plaintiff frames those other roles as an "assignment" to more

prestigious teams, (ECF No. 75 at ¶¶ 130, 145), not as a promotion. And he fails to

explain whether these assignments would come with other material benefits like

increased pay or a new title. Failing to receive a more prestigious assignment,

without any change in the conditions of his employment, is not an adverse

employment action. *See Klein v. N.Y. Univ.*, 786 F. Supp. 2d 830, 846 (S.D.N.Y. Apr.

1, 2011) (holding that professor's failure to be selected for faculty fellowship or

research professorship was not adverse action).

Instead, Plaintiff alleges in his second amended complaint that not being

assigned to those roles caused him to lose later opportunities for career

advancement, as members of the drug task force and traffic car unit are more likely

to achieve roles like a sergeant or detective. (ECF No. 75 at ¶¶ 144–47, 150). Thus,

a finder of fact may conclude that he suffered an adverse employment action,

because not receiving those assignments was "deleterious to . . . [his] current or

future employment," *Davis-Garrett*, 921 F.3d at 43, thereby satisfying this element

of his prima facie burden.

### 4. Whether Circumstances Give Rise to an Inference of Discrimination

30

Defendants also argue that Plaintiff has no evidence to show that the adverse employment actions were taken under circumstances giving rise to an inference of discrimination based on Plaintiff's Hispanic national origin, either directly or through circumstantial evidence of disparate treatment. (ECF No. 114 at 19-21). The Court agrees.

In both Plaintiff's motion papers and second amended complaint, he alleges that he is Hispanic but consistently frames his discrimination "based upon his failure to conform to racial stereotypes" (ECF No. 75 at ¶ 2), given his upbringing in Yonkers. He highlights specific instances – in 2014 and 2015 – where Hunter allegedly made derogatory comments to him that being raised in Yonkers "wasn't the best approach,"[13] his "Yonkers ghetto" did not add up to Hunter's "Eastchester professional,"[14] "this is what Yonkers does,"[15] and "this is how Yonkers trains its men."[16] He repeatedly alleges that members of the Department treated him differently because he was raised in Yonkers, and that they believed Yonkers to be a less desirable place than Eastchester. (ECF No. 75 at ¶¶ 45, 54). But nowhere does Plaintiff provide non-speculative evidence that Hunter's remarks were about Plaintiff's Hispanic national origin, or that any adverse employment actions he suffered were based on his Hispanic national origin. Indeed, Plaintiff provides scant evidence that Defendants even knew he was Hispanic when these remarks were

---

[13] ECF No. 75 at ¶ 45.
[14] *Id.* at ¶ 54.
[15] ECF No. 119 at 59 ¶ 33.
[16] *Id.*

31

made.[17] *See, e.g.*, *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 82 (2d Cir. 2005)
(noting "that a defendant's discriminatory intent cannot be inferred, even at the
prima facie stage, from circumstances unknown to the defendant"); *see also Forbes*,
2025 WL 743945, at *7–8 (S.D.N.Y. Mar. 7, 2025) (granting summary judgment
where plaintiff failed to show that decision-makers were aware of her pregnancy
when they terminated her employment).

Not even Plaintiff seemed to think that his discrimination was based on his
Hispanic national origin. Indeed, Plaintiff never mentioned being Hispanic or being
discriminated against on that basis in his August 2018 letter to the Town, which
first alerted them to his discrimination claim.[18] Nor did he state that he was
Hispanic or that the alleged discrimination was based on his Hispanic national

---

[17] In Plaintiff's Rule 56.1 statement, he asserts that it was made known at a union meeting in
August 2016 that he was Hispanic. (ECF No. 119 at ¶ 21). But the supporting evidence is an excerpt
from the Casey deposition, in which the deponent says that Plaintiff stated he was "Ecuadorian" but
does not believe Defendant Bonci was there. (ECF No. 117-4 at 7–8). Plaintiff also appears to cite to
the Conacchio deposition (which the Court located at ECF No. 117-19), which says nothing about a
union meeting. And finally, Plaintiff cites a group of documents relating to a fingerprint search
conducted before he was hired by the Department. (ECF No. 112-26 at 5). Although he points to one
mention of his ethnicity as "Hispanic" in connection with his application to be a security guard in
August 29, 2011, that same document otherwise consistently lists his ethnicity as "Not Hispanic,"
including in connection with his application to the Department on June 7, 2012. (*Id.* at 3, 5). In any
case, Plaintiff testified that he never saw this document and did not offer up the information
contained within it. (ECF No. 119 at ¶ 30). And Defendant Hunter testified that he never saw this
document, just that somebody internally at the Department would have reviewed it before Plaintiff
was hired. (ECF No. 112-12 at 80–81). Hunter also testified that he was not aware that Plaintiff was
Hispanic. (*Id.* at 80). And Bonci testified that he thought Plaintiff was Caucasian. (ECF No. 112-11
at 71–72).

[18] The August 28, 2018, letter from Plaintiff's counsel to the Town says Plaintiff has "legal claims for
racial discrimination" because he "is failing to conform to racial stereotypes." (ECF No. 117-21 at 2).
It makes no mention of Plaintiff being Hispanic or claiming discrimination on that basis. There is
apparently a September 20, 2018, letter that states that Plaintiff is Caucasian (ECF No. 117-21 at
3), and that he is asserting claims for race discrimination. (*Id.* at 9).

origin in either of his EEOC charges or in his original and first amended complaints.[19] And one would expect that if Plaintiff believed he was being discriminated against because of being Hispanic, he would have said so.

At most, Plaintiff provides evidence that he was discriminated against because he was "raised in an underprivileged, racially diverse neighborhood in Yonkers, New York" (*id.* at ¶ 36), which Defendants allegedly referred to in derogatory terms as the Yonkers "ghetto" (*id.* at ¶ 54), and that Plaintiff's appearance and manner of speaking was not "white" enough. (*Id.* at ¶ 41). All these allegations, if true, are deeply troubling. But being from Yonkers is not a race or national origin for purposes of a discrimination claim. Nor does being raised in a specific domestic city, like Yonkers, automatically equate to being Hispanic.

Perhaps one could argue that Defendants' references to Yonkers were code for being Hispanic and therefore amount to discrimination based on national origin. Plaintiff certainly tries to argue as much in his opposition. (ECF No. 118 at 15). But there is no evidence in the record to support an inference that the city of Yonkers is synonymous with being Hispanic.[20] Notably, in Plaintiff's second amended

---

[19] Instead, Plaintiff has consistently described himself as a Caucasian (ECF Nos. 1 at ¶ 15; 24 at ¶ 27; 113 at ¶ 19; 117-21 at 3, 9; 119 at ¶ 19) from Yonkers who "fail[ed] to conform to racial stereotypes." (ECF No. 75 at ¶ 2). In other words, he was Caucasian but didn't act "white" enough for Defendants.

[20] In support of his opposition, Plaintiff submitted an affidavit from a former supervisor at the Department, in which he averred that when Hunter and Bonci referred to Yonkers, they were referring to Plaintiff's Hispanic background and the neighborhood where he grew up. (ECF No. 116 at ¶ 8). But "affidavits submitted to defeat summary judgment must be admissible themselves or must contain evidence that will be presented in an admissible form at trial." *Fahrenkrug v. Verizon Servs. Corp.*, 652 F. App'x 54, 56 n.2 (2d Cir. 2016) (internal quotation marks and citation omitted). The former supervisor's statement regarding what he understood Hunter and Bonci to mean by

complaint, he made some attempt to explain how the phrase "Yonkers ghetto" could be seen as coded language. But he focused exclusively on the fact that "according to the U.S. Census Bureau, the July 1, 2019 estimated Black population of Yonkers was 18.4%, while the estimated Black population of the Town [of Eastchester] was 1.9%." (ECF No. 75 at ¶ 296). Elsewhere, Plaintiff refers to being criticized for his "appearance and manner of speaking as being more consistent with the appearance and manner of speaking of a black police officer than a Caucasian police officer" (*id.* at ¶ 240) and refers to the phrase "ghetto" as being "associated with negative stereotypes of Black culture." (*Id.* at ¶ 246). Again, none of this equates to evidence of Yonkers being synonymous with Plaintiff's Hispanic national origin. *See Santiago*, 2024 WL 4354878, at *12 (finding plaintiff failed to satisfy fourth element of prima facie burden because he failed to connect the dots as to how his national origin played a role in adverse actions); *De la Concha v. Fordham Univ.*, 5 F. Supp. 2d 188, 192 & n.3 (S.D.N.Y. 1998) (finding plaintiff failed to satisfy prima facie burden on national origin discrimination claim because record had no evidence that his national origin played role in his termination).

But even assuming these remarks about Yonkers were about Plaintiff's Hispanic national origin, Plaintiff also fails to show a sufficient nexus between his Hispanic national origin and the adverse employment actions he suffered. *See*

---

Yonkers is wholly speculative, which is insufficient to demonstrate an inference of discrimination. *See Ghose v. Century 21, Inc.*, 108 F. Supp. 2d 373, 378 (S.D.N.Y. 2000) (finding evidence that defendants insulted plaintiff's accent was wholly speculative and not sufficient to satisfy prima facie element), *aff'd*, 12 F. App'x 52 (2d Cir. 2001).

*Wheeler v. Praxair Surface Techs., Inc.*, 694 F. Supp. 3d 434, 457 (S.D.N.Y. 2023) (finding plaintiff failed to meet prima facie case on inference of discrimination where he failed to come forward with non-speculative evidence that adverse employment action "was based on his being Black"); *Zhang v. Barr Lab'ys, Inc.*, No. 98CV5717DC, 2000 WL 565185, at *4–5 (S.D.N.Y. May 8, 2000) ("Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision"). As noted above, the derogatory comments allegedly took place in 2014-2015. But the specific adverse employment actions Plaintiff complains about relate to events in 2018 or later. (*See* Section I, above) And nowhere does Plaintiff point to evidence that shows that his Hispanic national origin played any role in those later adverse employment actions. *See, e.g., Bermudez v. City of New York*, 783 F. Supp. 2d 560, 581 (S.D.N.Y. 2011) (noting that it is insufficient to simply recite the "false syllogism: (1) I am (insert name of protected class); (2) something bad happened to me at work; (3) therefore, it happened because I am (insert name of protected class).").

In any event, to the extent Plaintiff attempts to point to disparate treatment between him and a coworker as evidence of circumstances giving rise to an inference of discrimination, his argument is unavailing. To demonstrate disparate treatment, Plaintiff must establish that he was treated "less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). A coworker is considered similarly situated if

35

he or she "engaged in comparable conduct" and was "subject to the same performance evaluation and discipline standards." *Ruiz v. County of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010) (internal quotation marks and citation omitted). Put differently, plaintiff must show that he and his comparator "shared sufficient employment characteristics," including similarities in seniority, duties, and quality of performance. *Hornig v. Trs. of Columbia Univ. in City of N.Y.*, No. 17 Civ. 3602 (ER), 2022 WL 976267, at *18 (S.D.N.Y. Mar. 31, 2022) (internal quotation marks and citations omitted); *see DeJesus v. Starr Tech. Risks Agency, Inc.*, No. 03 Civ.1298 RJH, 2004 WL 2181403, at *9 (S.D.N.Y. Sept. 27, 2004).

Between his pleadings and opposition papers, Plaintiff identifies no less than 18 alleged comparators. Officers Bonci, Jr., Dura, Guerriero, Park, Louros, and Yanni, Lieutenant Kiernan, Sergeants Bernstein and Castellano, and Detective Santomauro are identified by name, but the remaining comparators are only identified by initials.[21] (ECF Nos. 75 at ¶¶ 139–40, 142–48, 173–74, 179, 192–93, 224, 231; 118 at 20; 119 at 85–91 ¶¶ 264–320). Many of Plaintiff's arguments asserting disparate treatment are generalized assertions that these comparators "were subject to the same performance evaluations, disciplinary standards, and supervision," (ECF No. 75 at ¶ 194), engaged in worse behavior than him, and were either not disciplined or disciplined less harshly.

---

[21] Plaintiff only identifies these comparators as "AC," "DF," "K," "RR," "RN," "KP," "AB," and "GC." (ECF No. 119 at 86 ¶¶ 267–313).

36

But he provides little to no information regarding the employment characteristics of these individuals. For instance, he alleged that Dura and Yanni were assigned to the drug task force over him, and that Bonci, Jr., Dura, Park, and Louros were assigned to the traffic car unit over him. (ECF No. 75 at ¶¶ 142–48). But the record is devoid of any additional information about how long these individuals were at the Department and how well they performed. The same is true for the comparators identified only by their initials. Plaintiff asserts that those individuals engaged in conduct such as skipping work, issuing baseless tickets, and drug use. (ECF No. 119 at 86 ¶¶ 267–313). But the record is devoid of any information about their employment characteristics. The only information Plaintiff puts forth is about what penalties were imposed, and many of those individuals were allegedly penalized with loss of vacation days, demotions, or forced resignation, (*id.*), which cuts against Plaintiff's argument that he was discriminated against when he lost vacation days in October 2019 and was later terminated. That lack of information regarding the employment characteristics of the comparators means a reasonable jury would be unable to determine whether they are sufficiently similarly situated to Plaintiff. *See Alvarado v. Nordstrom, Inc.*, 685 F. App'x 4, 7–8 (2d Cir. 2017).

Officer Guerriero is the only comparator identified with sufficient information in the record for a jury to determine whether he and Plaintiff are similarly situated. Guerriero was present with Plaintiff during the January 2021 incident that resulted in the investigation resulting in Plaintiff's termination, and

37

Plaintiff argues that Guerriero was similarly situated to him but no subjected to an investigation or termination. (ECF No. 118 at 17).

Here, Plaintiff fails to demonstrate that he was similarly situated to Guerriero. First, Guerriero was less senior than Plaintiff. As of January 2021, Plaintiff had worked for the Department for almost ten years, compared to Guerriero's tenure of roughly one year. *See Hornig*, 2022 WL 976267, at *18 (finding Plaintiff failed to establish sufficient comparator because he was "more senior" than comparator, who was junior faculty member). Second, Guerriero had no history of disciplinary issues, unlike Plaintiff, who was previously investigated twice for failing to follow Department search procedures. *See Alvarado*, 685 F. App'x at 7–8 (finding no causation where comparator had no similar history of incidents similar to plaintiff's).

Third, and finally, Guerriero's conduct and Plaintiff's conduct were "not of comparable seriousness." *Miceli v. Mehr*, 830 F. App'x 63, 65 (2d Cir. 2020). Plaintiff's disciplinary charges of insubordination and incompetence stemmed, in part, from his actions after the January 2021 incident when he allegedly "ma[de] a false report to a superior officer," "ma[de] a false police report," and "fail[ed] to cooperate fully and truthfully in an internal affairs interview." (ECF No. 113 at ¶ 159). There is no evidence in the record showing Guerriero engaged in any similar conduct. Further, Guerriero's conduct *during* the January 2021 incident did not rise to the level of seriousness that's Plaintiff's conduct did. Although Guerriero, like Plaintiff, failed to search the arrestee before placing him in the cell, Guerriero never

38

unholstered his taser. Plaintiff's decision to draw his taser was an additional reason for his two disciplinary charges, and is a significant step beyond failing to properly search an individual. It involved a display of force not seen when simply performing a routine search. Thus, Plaintiff fails to satisfy this prong of his prima facie burden, as no reasonable finder of fact could conclude that Plaintiff and Guerriero are similarly situated. *See Miceli*, 830 F. App'x at 65 (finding Plaintiff police officer and officer comparators not similarly situated because comparators "engaged in a verbal argument" whereas Plaintiff "engaged in a physical fight with a civilian" and was accused of lying in a letter regarding his procurement of a vehicle); *Alvarado*, 685 F. App'x at 7–8 (finding comparators "small acts of insubordination" did not rise to the level of Plaintiff's more aggressive conduct).

By failing to satisfy at least one of the prongs of his initial burden, the burden does not shift to Defendants to provide legitimate, nondiscriminatory reasons for Plaintiff's termination, and Defendants are entitled to summary judgment on Plaintiff's discrimination claims. *See Ali*, 2022 WL 2443010, at *3 (affirming summary judgment for defendants because plaintiff failed to satisfy initial burden of *McDonnell Douglas* framework).

## D.    Plaintiff's Retaliation Claims

Defendants argue that all of Plaintiff's retaliation claims should be dismissed because he cannot satisfy his initial burden to demonstrate a causal connection between his protected activity and any adverse employment action. (ECF No. 114 at

39

23–26). They also argue that Plaintiff has no direct or indirect evidence that the adverse action occurred because of his protected activity. (*Id.*).

Plaintiff argues in opposition that he has shown a sufficient connection because his protected activity, this ongoing litigation, was in close temporal proximity to his termination. (ECF No. 118 at 16–17). He further argues that he can show retaliation because another officer was treated differently from him, in that the other officer was not punished. (*Id.*).

Like Plaintiff's national origin discrimination claims, Plaintiff's retaliation claims under Title VII, Section 1983, and the N.Y.S.H.R.L. are all analyzed under the same *McDonnell Douglas* burden-shifting standard. Plaintiff bears the initial burden to show that (1) he was engaged in an activity protected under the specific statute, (2) Defendants were aware of his participation in that protected activity, (3) he suffered an adverse employment action, and (4) there was a causal connection between his protected activity and that adverse action. *See Yu v. N.Y.C. Hous. Dev. Corp.*, 494 F. App'x 122, 126 (2d Cir. 2012).

Here, it is undisputed that Plaintiff satisfies the first three prongs of that test; the parties only dispute whether he can satisfy the fourth prong and show a causal connection. Between his second amended complaint and his motion papers, the alleged protected activity consists of two events, his initial complaint to the Department on August 28, 2018, about discrimination, and the instant ongoing litigation. (ECF Nos. 75 at ¶ 167; 118 at 17). And he alleges two of the three adverse employment actions alleged in his discrimination claims—the loss of vacation days

40

in October 2019 and his termination in November 2021.[22] "Causation can be proven (1) directly through evidence of retaliatory animus directed against the plaintiff by the defendant; or (2) indirectly either (a) by showing that the protected activity was followed closely by discriminatory treatment, or (b) through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct." *D'Andrea v. Nielsen*, 765 F. App'x 602, 605 (2d Cir. 2019) (internal quotations marks and citation omitted).

As for direct evidence of retaliatory animus, Plaintiff fails to highlight any such evidence in his motion papers, instead choosing to focus on indirect evidence of temporal proximity and disparate impact. With respect to temporal proximity, no bright line distinguishes what amount of time is too attenuated to establish the requisite connection, which allows a court to exercise its judgment based on the context of the particular case. *See Littlejohn v. City of New York*, 795 F.3d 297, 319 (2d Cir. 2015); *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009). But courts "have generally held that causation can only be inferred after the passage of a few weeks or months." *D'Andrea*, 765 F. App'x at 605; *see Ball v. Marriott Int'l, Inc.*, 627 F.

---

[22] Although not addressed in his motion papers, Plaintiff's second amended complaint also stated that he suffered additional allegedly adverse employment actions in relation to his retaliation claims when he was not (1) recognized for his contributions to a September 2018 arrest, (2) allowed to participate in a local community outreach program, (3) allowed to manage the Department's social media page, and (4) not allowed to place a small Christmas tree in the office. (ECF No. 75 at ¶ 251). But no reasonable finder of fact could consider these to be adverse actions because they were not materially adverse changes to the terms and conditions of his employment. *See Pease*, 2021 WL 2651400, at *9 ("Not every unpleasant matter short of discharge or demotion creates a cause of action.") (internal quotation marks and citations omitted).

41

Supp. 3d 296, 323 (S.D.N.Y. 2022) ("[M]ore than nine months is too long a time to establish this causal relationship."); *Uddin v. City of New York*, 427 F. Supp. 2d 414, 434 (S.D.N.Y. 2006) (finding no causal connection where alleged adverse actions took place "more than nine months" after last alleged protected activity).

Viewing the chronology of Plaintiff's protected activities and the alleged adverse employment actions, Plaintiff cannot show a sufficient temporal connection. First, there is a gap of over 12 months between Plaintiff's first protected activity in August 2018 and his adverse action of losing vacation days in October 2019. That roughly yearlong gap of time is too long to demonstrate a causal connection. *See Ball*, 627 F. Supp. 3d at 323; *Uddin*, 427 F. Supp. 2d at 434. And the gap between this protective activity and his termination in November 2021 is even longer.

Second, Plaintiff's other protected activity—filing this action—occurred on November 27, 2019. But the only remaining adverse action he suffered— termination of employment—did not occur until November 16, 2021. That gap of almost two years is well beyond the period where a causal connection can be shown.[23] Even viewing his first amendment of his complaint in March 2020 as the latest protected activity,[24] that still creates a gap in time of over 18 months between his protected activity and the adverse action. That lengthy period of time is

---

[23] Because Plaintiff commenced this action after his loss of vacation days in October 2019, there can be no causal connection between this adverse action and the filing of this lawsuit. *See Miller v. Levi & Korsinsky, LLP*, 695 F. Supp. 3d 397, 417 (S.D.N.Y. 2023) (granting summary judgment on retaliation claims because adverse actions occurred before protected activity).
[24] Plaintiff's second amended complaint occurred after his termination, and, thus, cannot serve as a cause for his termination.

insufficient to demonstrate the causal connection needed to sustain a retaliation claim based on temporal proximity. *See Ball*, 627 F. Supp. 3d at 323; *Uddin*, 427 F. Supp. 2d at 434.

Plaintiff's contention that the litigation's ongoing status creates a causal connection by default through temporal proximity is unavailing. To show causation when the alleged protected activity is a pending cause of action, it must be shown that the adverse action was taken *"in response to"* the ongoing litigation. *Chidume v. Greenburgh-North Castle Union Free Sch. Dist.*, No. 18-cv-01790 (PMH), 2020 WL 2131771, at *11 (S.D.N.Y. May 4, 2020) (emphasis added); *see Cruz v. Lee*, No. 14 cv 4870 (NSR)(JCM), 2016 WL 1060330, at *7 (S.D.N.Y. Mar. 15, 2016) (finding causal connection where litigation was ongoing when adverse action occurred and defendant stated plaintiff was denied protective custody "because of the case against [defendant]"). But Plaintiff points to no evidence that the decision to terminate him was done *because* this action was ongoing. He merely argues that there is a sufficient connection because the two events occurred at the same time. But that correlation does not equal causation.

That lack of connection is emphasized by the fact that Hunter and Bonci did not initiate or complete the investigation of the November 2021 incident that led to Plaintiff's termination. That investigation was initiated and completed by nonparty Chief Rodriguez, (ECF Nos. 113 at ¶¶ 151–58; 119 at ¶¶ 151–58), who is not a named defendant here and is not alleged to have had any retaliatory animus against Plaintiff. The same holds true for the Hearing Officer; he is not named as a

43

defendant and Plaintiff proffers no evidence that he harbored any retaliatory animus against Plaintiff while conducting the hearing and issuing his recommendation.

Lastly, regarding disparate treatment, Plaintiff fails to demonstrate that a similarly-situated coworker was treated differently than him. As explained above in analyzing his discrimination claims, Plaintiff identified a host of alleged comparators, but there was insufficient information in the record to determine whether they were similarly situated to him. Officer Guerriero was the only alleged comparator with sufficient information to analyze whether he was similarly situated, and it was determined that he was not. (*See* Section III.C.4, above). Thus, Plaintiff fails to satisfy the causation prong of his initial burden, the burden does not shift to Defendants to provide legitimate, nondiscriminatory reasons for Plaintiff's adverse employment actions, and Defendants are entitled to summary judgment on Plaintiff's retaliation claims. *See Miceli*, 830 F. App'x at 65 (affirming grant of summary judgment on retaliation claims because plaintiff failed to satisfy causation prong of his initial *McDonnell Douglas* burden).

### E. Whether Defendants Had Legitimate, Nondiscriminatory Reasons

As noted above, once a plaintiff makes out their prima facie case on discrimination and retaliation, the burden shifts to the defendant "to demonstrate a legitimate, [nondiscriminatory] purpose for the adverse employment action." *Kirkland-Hudson*, 665 F. Supp. 3d at 449. Here, the Court has already found that Plaintiff has not satisfied his prima facie burden on either his discrimination or

retaliation claims, so the burden does not shift to Defendants. But even if Plaintiff had met his initial burden, Defendants have demonstrated legitimate, nondiscriminatory reasons for their actions.

In support of his discrimination and retaliation claims, Plaintiff points to the same three adverse actions: (1) not being assigned to either the drug task force or the traffic car unit in March 2018, (2) being penalized with a loss of vacation days in October 2019, and (3) being terminated in November 2021. And there is evidence in the record to support a nondiscriminatory reason for each of those actions. First, before March 2018, Plaintiff admitted that he failed to properly search an arrestee for contraband, was placed on three separate remedial training plans and a performance improvement plan, and admitted that he improperly discharged a taser. (ECF Nos. 112-38; 112-42; 112-46; 113 at ¶¶ 55–60, 63, 79-98, 109, 116–20; 119 at ¶¶ 55–60, 63, 79-98, 109, 116–20). Plaintiff even agreed to forfeit vacation days as a penalty for failing to search the arrestee (ECF Nos. 112-34) and was put on notice that any further instances of similar misconduct would result in additional disciplinary charges that could result in termination of his employment. (ECF Nos. 112-34; 113 at ¶¶ 61–62; 119 at ¶¶ 61–62). Those alleged mistakes also occurred after Plaintiff had been with the Department for multiple years. It is reasonable for a factfinder to conclude that Plaintiff's poor performance in the years before March 2018 rendered him unworthy of assignment to the "prestigious" (ECF No. 75 at ¶ 130) drug task force and traffic car unit, providing Defendants with a legitimate reason for not giving him those assignments.

45

Second, Plaintiff's second failure to search an arrestee in July 2019, standing alone, could reasonably be considered as a legitimate reason to penalize him by losing vacation days in October 2019, especially since Plaintiff agreed to the findings and punishment. (ECF Nos. 112-14; 113 at ¶¶ 121–28; 119 at ¶¶ 121–28). As noted above, Plaintiff failed to discover a bandana before placing the arrestee into a holding cell, which the arrestee later used in an attempted suicide by hanging. (ECF Nos. 112-14; 113 at ¶¶ 122, 125; 119 at ¶¶ 122, 125). An investigation occurred, during which Plaintiff admitted that he failed to search the arrestee. (ECF Nos. 112-14 at 4–5; 113 at ¶ 125; 119 at ¶ 125). After the investigation was complete, the Department proposed that Plaintiff lose three vacation days as a penalty for violating Department rules, and Plaintiff accepted the proposal in October 2019. (ECF Nos. 75 at ¶¶ 192–197; 112-14 at 6). When that second failure to search is added onto the other issues identified above, a factfinder would have even more evidence to conclude that Defendants had legitimate reasons for the loss of vacation days in October 2019.

Third, and finally, Plaintiff's termination in November 2021 occurred after the Town adopted a recommendation by a Hearing Officer that Plaintiff be terminated, which came after roughly four days of proceedings where the Hearing Officer viewed video evidence and heard witness testimony. (ECF No. 113 at ¶¶ 165, 168–72; 119 at ¶¶ 165, 168–72). Those proceedings stemmed from Plaintiff receiving formal charges for insubordination and incompetence after failing for a third time to search an arrestee properly. (*Id.*). Standing alone, those events would

46

also allow a jury to conclude that Defendants had a legitimate reason for
terminating him. Viewing those events together with the series of prior instances of
Plaintiff's poor performance only enhances the likelihood that a jury could conclude
Defendants had a legitimate reason to terminate him.

Defendants' legitimate, nondiscriminatory reasons for the adverse actions at
issue here are best described, generally, as Plaintiff's poor performance, and "[p]oor
performance is a legitimate [nondiscriminatory] reason for an adverse employment
action." *See Luo v. AIK Renovation Inc.*, No. 23-cv-5878 (LJL), 2024 WL 4444283, at
*8 (S.D.N.Y. Oct. 8, 2024). Thus, Defendants have shown that a finder of fact could
conclude that they possessed legitimate, nondiscriminatory reasons for the adverse
actions highlighted by Plaintiff, thereby satisfying their shifted burden. *Id.*

### F.      Whether Plaintiff Has Demonstrated Pretext

Here, the Court has already found that Plaintiff has not satisfied his prima
facie burden on either his discrimination or retaliation claims, and that even if he
had satisfied this burden, Defendants have provided legitimate, nondiscriminatory
reasons for the adverse employment actions. But assuming Plaintiff had satisfied
his prima facie burden, the burden would now shift back to Plaintiff to demonstrate
that Defendants' conduct was merely pretext for the alleged discrimination and
retaliation. *Kirkland-Hudson*, 665 F. Supp. 3d at 449.

Plaintiff contends that he has demonstrated pretextual discrimination and
retaliation because a jury could conclude that Defendants' nondiscriminatory reason
of poor performance was false. (ECF No. 118 at 16). He further contends that even if

47

Defendants proffer nondiscriminatory reasons for their adverse actions, the mere fact that the analysis reached the shifted burden on pretext means summary judgment must be denied, because a jury must weigh the prima facie elements against Defendants' nondiscriminatory reasons. (*Id.* at 16–20). In reply, Defendants argue that the Court need not address pretext because Plaintiff fails to satisfy his prima facie burden on his discrimination and retaliation claims. (ECF No. 124 at 10, 12). As discussed below, for the same reasons Plaintiff fails to meet his prima facie burden, Plaintiff has also failed to show that Defendants' legitimate, nondiscriminatory reasons for the adverse employment actions were pretextual.

### 1. Whether Plaintiff has Shown Pretextual Discrimination

To demonstrate pretextual discrimination, Plaintiff must produce enough evidence for a rational fact finder to conclude either that (1) the legitimate, nondiscriminatory reasons offered by Defendants were false, or (2) his status as a member of a protected class was a motivating factor in Defendants taking the adverse action. *Bart v. Golub Corp.*, 96 F.4th 566, 576 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 173 (2024). "The plaintiff must 'produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, [nondiscriminatory] reasons proffered by the defendant were false, and that more likely than not the discrimination was the real reason for the employment action.'" *Rivera v. Greater Hudson Valley Health Sys.,* No. 21-cv-1324 (NSR), 2023 WL 2588308, at *9 (S.D.N.Y. Mar. 21, 2023) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)). A plaintiff may also satisfy this burden by producing

48

other evidence that the employer's adverse action was motivated at least in part by the plaintiff's membership in a protected class. *See Bart,* 96 F.4th at 576. "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." *Weinstock*, 224 F.3d at 42. Summary judgment is appropriate when a defendant "has come forward with evidence of a dispositive nondiscriminatory reason" that no finder of fact could reject. *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995). A nondiscriminatory reason is dispositive when it is "egregious enough to merit the discipline imposed." *Edwards v. Khalil*, No. 12 Civ. 8442 (JCM), 2016 WL 1312149, at *20 (S.D.N.Y. Mar. 31, 2016).

Plaintiff fails to demonstrate pretextual discrimination as to all three of the adverse employment actions at issue here. First, with respect to his termination, Plaintiff does not allege that the actual decisionmakers for that adverse action made any discriminatory statements or had engaged in any other discriminatory conduct. His pleadings and motion papers contain no allegations that Chief Rodriguez and the Hearing Officer participated in any discrimination, which is supported by their absence as named defendants. Nor does the evidence in the record allow a rational finder of fact to conclude that Defendants' proffered reason for termination—poor performance exhibited through insubordination and incompetence—was false. As noted above, Plaintiff's termination in November 2021 occurred after the Town adopted a recommendation by an independent Hearing Officer that Plaintiff be terminated, which came after roughly four days of proceedings where the Hearing Officer viewed video evidence and heard witness

49

testimony. (ECF No. 113 at ¶¶ 165, 168–72; 119 at ¶¶ 165, 168–72). And, as
explained above, the connection between the earlier statements allegedly made by
Defendant Hunter about Yonkers and Plaintiff's Hispanic national origin is
missing. In short, the evidence, taken as a whole, does not support a rational
inference that Plaintiff's Hispanic national origin was a motivating factor in
deciding to terminate him.

Second, the same holds true for Plaintiff's second adverse action of losing
vacation days in October 2019, a penalty that stemmed from his second failure to
search an arrestee. No rational fact finder could conclude that the legitimate,
nondiscriminatory reasons offered by Defendants were false or that Plaintiff's
Hispanic national origin was a motivating factor. Indeed, Defendants have come
forward with evidence of a dispositive, nondiscriminatory reason that no finder of
fact could reject: first, Plaintiff previously lost days for similar conduct and, second,
he admitted to the conduct in both instances. After Plaintiff's first failure to
properly search an arrestee, he agreed to a penalty in which he lost multiple
vacation days. (ECF Nos. 113 at ¶¶ 60–62; 119 at ¶¶ 60–62). His loss of vacation
days in October 2019 also resulted from his admitted failure to search an arrestee,
and he agreed to the penalty of losing vacation days. (ECF Nos. 113 at ¶ 127; 119 at
¶ 127). No rational finder of fact could conclude that Plaintiff's conduct was not
worthy of the penalty imposed, as he agreed to it and had accepted a nearly
identical penalty previously.

Third, and finally, with respect to Defendants' decision not to assign Plaintiff to the drug task force and traffic car unit in March 2018, no rational fact finder could conclude that the legitimate, nondiscriminatory reasons offered by Defendants were false or that Plaintiff's Hispanic national origin was a motivating factor. By the time Plaintiff requested an assignment with those teams, he had already been subjected to one forfeiture of vacation days, multiple remedial training plans, a performance improvement plan, and had improperly discharged a taser. (*See* Section I.A.–E., above). Even if one assumes that the remedial training and improvement plans were unwarranted, as Plaintiff suggests, there is no getting around the fact that Plaintiff admitted to the improper search and accepted the forfeiture of vacation days as the appropriate punishment (ECF Nos. 75 at ¶ 192–97; 112-14 at 6; 113 at ¶¶ 121–28; 119 at ¶¶ 121–28) and admitted to improperly discharging a taser (ECF Nos. 112-10 at 97–102; 112-46 at 3–4; 113 at ¶¶ 116–20; 119 at ¶¶ 116–20). And as noted above, the evidence that Plaintiff's Hispanic national origin was a motivating factor in these assignment decisions is speculative at best, given Plaintiff's failure to connect any discriminatory comments in 2014 and 2015 to his Hispanic national origin or to Defendant's assignment decision roughly three years later. (*See* Section III.C.4., above).

## 2. Whether Plaintiff has Shown Pretextual Retaliation

To demonstrate pretextual retaliation, Plaintiff must make a slightly different showing from what is required for pretextual discrimination. Plaintiff must demonstrate that Defendants' alleged retaliation "was a 'but-for' cause for the

51

adverse action, and not simply a 'substantial' or 'motivating' factor" in their
decisions. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845–46 (2d Cir. 2013).

In other words, he must show that the adverse actions "would not have
occurred in the absence of the retaliatory motive." *Fu v. Consol. Edison Co. of N.Y.,
Inc.*, 855 F. App'x 787, 791 (2d Cir. 2021) (internal quotation marks and citation
omitted). This may be achieved "by demonstrating weaknesses, implausibilities,
inconsistencies, or contradictions in the employer's proffered legitimate,
nonretaliatory reasons for its action." *Zann Kwan*, 737 F.3d at 846.

Plaintiff fails to demonstrate that there was pretextual retaliation. Focusing
on each specific adverse action, no rational finder of fact could conclude that the
action would not have occurred without retaliatory motive. First, Plaintiff admitted
to the underlying violation and agreed to the punishment of loss of vacation days in
October 2019. (ECF Nos. 112-14 at 6; 113 at ¶ 127; 119 at ¶ 127). Unlike his
termination, which was unilaterally imposed by the Hearing Officer and the Town,
he had a hand in the creation of this action. This action would have occurred even if
there were no retaliatory motive. *See Hardy v. Rochester Genesee Reg'l Transp.
Auth.*, 906 F. Supp. 2d 178, 187 (W.D.N.Y. 2012) (finding no pretextual retaliation,
in part, because plaintiff entered into agreement at center of adverse action).
Second, Plaintiff's termination came after four days of proceedings before a neutral
Hearing Officer, involving multiple witnesses and an expert. (ECF Nos. 113 at
¶¶ 163–65; 119 at ¶¶ 163–65). And the underlying investigation was started by a
supervisor, who is not a named defendant here and is not alleged to have had any

retaliatory animus against Plaintiff. (ECF Nos. 113 at ¶ 151; 119 at ¶ 151). Indeed, Plaintiff fails to allege any retaliatory motive to those two individuals. *See Sheafe-Carter v. Donohue*, No. 11-CV-4128, 2013 WL 4458746, at *7 (E.D.N.Y. Aug. 16, 2013) (finding no pretextual retaliation, in part, because plaintiff failed to point to statements attributable to decisionmakers), *aff'd*, 579 F. App'x 4 (2d Cir. 2014), *cert. denied*, 575 U.S. 921 (2015).

Thus, Plaintiff fails to satisfy his shifted burden to demonstrate pretextual retaliation. No rational finder of fact could conclude that Plaintiff's loss of vacation days in October 2019 and his termination in 2021 would not have occurred but-for retaliatory motive. *See Newbury v. City of Niagara Falls*, No. 23-7976-cv, 2025 WL 323340, at *5–6 (2d Cir. Jan. 29, 2025) (affirming summary judgment to defendant on retaliation claim, even assuming plaintiff met prima facie burden, because plaintiff failed to produce evidence that termination would not have occurred but for improper retaliation).

## IV.   CONCLUSION

For the above reasons, the motion for summary judgment by Defendants Town of Eastchester, Timothy Bonci, and Jeffrey Hunter is GRANTED. The Clerk of the Court is respectfully directed to terminate the pending motion at ECF No. 111, enter judgment for Town of Eastchester, Timothy Bonci, and Jeffrey Hunter, and close the case.

**SO ORDERED.**

DATED:      White Plains, New York

March 31, 2025

_____

VICTORIA REZNIK
United States Magistrate Judge